# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-40521

United States Court of Appeals
Fifth Circuit

**FILED**

April 14, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

    Plaintiff - Appellee

v.

TARIQ MAHMOOD, M.D.,

    Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before STEWART, Chief Judge, and OWEN and COSTA, Circuit Judges.

CARL E. STEWART, Chief Judge:

Following an investigation into billing practices at several of his hospitals, a jury convicted Defendant-Appellant Tariq Mahmood ("Mahmood") of one count of conspiracy to commit health care fraud, seven counts of health care fraud, and seven counts of aggravated identity theft. After denying his motion for new trial, the court sentenced Mahmood to 135 months' imprisonment and ordered him to pay $599,128.02 in restitution. Mahmood now appeals, challenging the sufficiency of the evidence supporting most of his convictions, the denial of his motion for new trial, and the district court's calculation of his sentence and restitution. We AFFIRM Mahmood's

No. 15-40521

convictions and the new trial ruling. However, we VACATE Mahmood's sentence and the restitution order, and REMAND for resentencing.

## I.

All relevant facts produced at trial and discussed here are taken in the light most favorable to the jury's verdict. *See, e.g.*, *United States v. Haines*, 803 F.3d 713, 734–35 (5th Cir. 2015).

## A. Background

Mahmood was a licensed physician who owned a number of Texas hospitals, each of which was an authorized Medicare and Medicaid provider. The events leading to Mahmood's run-in with the law focus on Medicare and Medicaid's billing procedures[1] and Mahmood's efforts to persuade employees at his hospitals to manipulate those procedures to increase insurance reimbursements.

A key part of Medicare's reimbursement process involves the manner in which hospitals communicate to Medicare what services the hospital has rendered to patients. Part of this process involves hospital employees known as "coders." Coders cull through a patient's medical record and document the condition that treating physicians have labeled as a patient's principal diagnosis, *i.e.*, the condition established after study of the medical record to be the primary reason that the patient was admitted to the hospital for treatment, and any secondary diagnoses, *i.e.*, conditions that render a patient's stay longer or more difficult, such as those requiring increased diagnostic procedures, testing, or medication. Coders translate these diagnoses into what are essentially standardized billing codes, which the hospital then sends to Medicare on a reimbursement claim form. Crucial here, the sequencing or

---

[1] Medicare and Medicaid operate in a substantially similar manner, and the undisputed trial evidence reflects that Mahmood's fraudulent conduct financially impacted both programs. For simplicity, we generally refer only to Medicare.

2

order of the codes submitted on a hospital's claim form—particularly the designation of which diagnosis code is primary as opposed to which diagnosis codes are secondary—often affects the payment that Medicare will make as reimbursement for the claim. As one might expect, more complex primary diagnosis codes often trigger increased reimbursements from Medicare.

Mahmood's efforts to manipulate Medicare-billing procedures at his hospitals began in 2005, when he instructed Ruth Ann Crow ("Crow"), former Medical Records Director at Lake Whitney Medical Center ("Lake Whitney"), to fax him the "diagnosis code sheet"[2] for all of Lake Whitney's inpatient Medicare patients. Without treating these patients or reviewing their medical records, Mahmood would then fax back the code sheets with handwritten changes or telephone Crow and advise her how he wanted the diagnosis codes resequenced. Most commonly, Mahmood instructed Crow to switch a patient's primary diagnosis with a secondary diagnosis—*e.g.*, recoding a urinary tract infection with a coinciding bacterial infection to a bacterial infection with a coinciding urinary tract infection—or to add complications to a patient's primary diagnosis—*e.g.*, recoding chronic renal failure to acute renal failure with necrosis. In either case, Crow would access the hospital's billing system, switch the codes the way Mahmood wanted, and then submit the resequenced codes as reimbursement claims to Medicare.

Eventually Mahmood sought to extend the same ploy to some of his other hospitals, but employees at those hospitals were not as willing as Crow to participate. After two employees were unable or unwilling to assist Mahmood, he targeted Norma Longley ("Longley"), former inpatient coder for Renaissance Hospital Terrell ("RH Terrell") and Cozby Germany Hospital ("Cozby

---

[2] The trial evidence reflects that "diagnosis code sheets" are single pieces of paper with notations of a patient's primary diagnosis and any secondary diagnoses.

No. 15-40521

Germany"), and began asking her to make many of the same coding changes that he had requested of Crow. Longley refused to make Mahmood's requested changes because patients' medical records did not support them.

Once snubbed by Longley, Mahmood's plan spiraled. From early 2010 through early 2012, Mahmood instructed Longley to fax him the diagnosis code sheets for Medicare patients at RH Terrell and at Cozby Germany. Mahmood did not request the medical records that accompanied these coding sheets, nor did he respond to Longley's faxes with further instructions. Before sending Mahmood the codes, Longley documented them on a separate sheet for her records and entered them into the hospital's billing system using her username, RHNORMA.

At some point, Longley began receiving audit letters indicating that Medicare had reviewed and denied many of the claims that she had coded and entered into the hospital's billing system. Each time she received such a letter, Longley compared her original code sheets to the audit letters and determined that her original coding matched what the Medicare auditor said should have been coded. Longley would then pull the medical records for the audited claims, at which time she learned that Charlotte Wyatt ("Wyatt"), former Health Information Management Supervisor at Cameron Hospital, Inc. ("Cameron"), had accessed the system and changed the codes using the usernames RHCHARLOTTE or CAMERON.

At trial, Wyatt testified that Mahmood tasked her with not only resequencing her own coding for patients at Cameron, but also surreptitiously accessing and resequencing claim forms entered by other coders on behalf of patients at other hospitals. Specifically, Wyatt testified that, at times, she received faxed code sheets from Longley. Per Mahmood's instructions, Wyatt would fax these code sheets on to Mahmood. Mahmood would then telephone Wyatt and tell her which sheets needed to be changed or resequenced to

4

increase Medicare reimbursements. To pad an expected Medicare reimbursement, Wyatt would either add complications to a patient's primary diagnosis, switch a patient's primary diagnosis with one of their secondary diagnoses, or change a patient's primary diagnosis completely by adding a new diagnosis that was not documented in the patient's medical record.

In January 2011, the United States Department of Health and Human Services ("HHS") joined an ongoing state investigation into billing practices at Mahmood's hospitals. At trial, HHS Special Agent Jack Geren ("Geren") explained the methodology of the Government's investigation. Based on Longley's original coding sheets and a federal search warrant executed on computer servers at Mahmood's hospitals, the Government was able to identify eighty-five claims that had been accessed by multiple users, *i.e.*, claims that Longley had originally coded and that Wyatt had thereafter secretly accessed and resequenced at Mahmood's direction. The Government also obtained faxes that corresponded with fifty of the eighty-five identified claims.

Geren explained how the evidence extracted from the hospital's billing system and the faxes demonstrated Wyatt's resequencing of Medicare claims at Mahmood's direction. For example, on one occasion, the hospital's billing system reflected that username RHNORMA (Longley) entered diagnosis codes for a patient at 7:45 am. At 8:43 am the same morning, Longley faxed the patient's diagnosis code sheet—without the rest of the patient's medical record—to Mahmood. At 12:02 pm the next day, username RHCHARLOTTE (Wyatt) accessed the hospital's billing system and resequenced Longley's original coding by switching the patient's primary diagnosis with her secondary diagnosis. This particular change resulted in Mahmood's hospital receiving a $3,503.81 overpayment from Medicare.

During the Government's investigation, expert witness and HHS auditor Paul Porrier ("Porrier") "repriced" the eighty-five claims where Wyatt had

No. 15-40521

resequenced Longley's codes to determine what Medicare would have reimbursed Mahmood's hospitals had the claims been submitted to Medicare as originally coded by Longley.  Geren then subtracted this repriced figure from the amount that Medicare actually reimbursed based on the claims as resequenced and submitted by Wyatt.  Based on this methodology, Geren testified that, with respect to the eighty-five identified claims, Medicare had collectively overpaid Mahmood's hospitals $143,608.  Specifically, Mahmood's hospitals billed $1,926,307.80 to Medicare in connection with the eighty-five claims, Medicare actually reimbursed Mahmood's hospitals $574,247.67, and Medicare would have reimbursed Mahmood's hospitals only $430,639 if the claims had been billed as originally coded by Longley.

## B. Proceedings Below

Following the Government's investigation, a federal grand jury returned a fifteen-count superseding indictment, charging Mahmood with one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; seven counts of health care fraud, all in violation of 18 U.S.C. §§ 1347 and 2; and seven counts of aggravated identity theft, all in violation of 18 U.S.C. §§ 1028A and 2.  As to the substantive health care fraud counts, the Government identified seven specific patients at Mahmood's hospitals and alleged, *inter alia*, that Mahmood executed a scheme to defraud Medicare by inappropriately resequencing diagnosis codes on Medicare claim forms submitted on behalf of those patients.  As to the aggravated identity theft counts, the Government pointed to the same seven patients and alleged that Mahmood knowingly used their means of identification while committing health care fraud.

Mahmood opted for trial.  At the close of evidence, he moved for a judgment of acquittal on the conspiracy count and the aggravated identity theft counts, which the court denied.  Thereafter, the jury found Mahmood guilty on all fifteen counts in the superseding indictment.

No. 15-40521

Between the jury's verdict and sentencing, Mahmood obtained new counsel and filed a motion for new trial. Therein, he represented that his trial counsel was in possession of a report from Christina Melnykovych ("Melnykovych") and Tina Pelton ("Pelton"), two experts who had audited the medical records of the patients named in the superseding indictment. Mahmood then argued, *inter alia*, that trial counsel rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to call either expert to testify at trial. In a written order, the district court denied Mahmood's motion.

At sentencing, and over Mahmood's objection, the district court calculated the total loss caused by Mahmood's fraud to be $599,128.02, which was the aggregate amount that insurance companies reimbursed Mahmood's hospitals, and which resulted in a 14-point enhancement to Mahmood's base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(H).[3] After other adjustments not at issue here, Mahmood's total offense level became 24, along with a criminal history category I. This resulted in a Guidelines-sentencing range of 51 to 63 months' imprisonment on the conspiracy and health care fraud counts,

---

[3] Mahmood's Presentence Investigation Report ("PSR") calculated an initial base offense level of 28, which included, *inter alia*, a 16-point enhancement for a total loss of $1,978,531.33, *i.e.*, the aggregate dollar amount that Mahmood's hospitals billed to insurance companies. Mahmood's objection to the PSR's loss calculation was two-fold. First, Mahmood argued that the $1,978,531.33 figure overstated his intended loss under U.S.S.G. § 2B1.1 comment. (n.3(F)(viii)). Based on this first objection, Mahmood argued that the loss should be reduced to $599,128.02, which was the portion of the amounts billed that Mahmood's hospitals expected to be reimbursed. Second, Mahmood argued that U.S.S.G. § 2B1.1 comment. (n.3(E)(i)) entitled him to an additional offset for the fair market value of the services that his hospitals rendered to patients, such that the loss should have been further reduced to $143,608. The district court sustained in part and overruled in part Mahmood's objection. The court found that the PSR's loss calculation overstated Mahmood's intended loss and therefore reduced the loss amount to $599,128.02; however, the court denied Mahmood's request for a further offset based on the fair market value of services that his hospitals rendered to patients. As we explain *infra*, only the fair-market-value credit is at issue on appeal.

and statutory sentences of 24 months' imprisonment on each of the aggravated identity theft counts.

Following argument from the parties, the district court sentenced Mahmood to a total of 135 months' imprisonment, consisting of: 63 months' imprisonment on the conspiracy and health care fraud convictions, to run concurrently; 24-month sentences on three of the aggravated identity theft convictions, each to run consecutive to one another and to the sentence imposed on all other counts; and 24-month sentences on the remaining aggravated identity theft convictions, to run concurrently to all other sentences. In addition to his sentence, the district court ordered Mahmood to pay restitution to Medicare, Medicaid, and a private insurer in the total amount of $599,128.02 pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A.

## DISCUSSION

Mahmood raises a host of arguments on appeal. He first challenges the sufficiency of the evidence on each of his health care fraud and aggravated identity theft convictions. He next asserts that the district court erred in denying his motion for new trial without first holding an evidentiary hearing. Finally, he raises several issues related to his sentence and the district court's restitution order. We address each argument in turn.

### I. Health Care Fraud

We first consider Mahmood's challenge to the sufficiency of the evidence on his health care fraud convictions. Mahmood concedes that he failed to preserve this challenge by including his health care fraud convictions in his motion for acquittal. Accordingly, we may vacate Mahmood's convictions for want of evidence only if he demonstrates "a manifest miscarriage of justice," meaning "the record is devoid of evidence pointing to guilt or contains evidence on a key element of the offense that is so tenuous that a conviction would be

shocking." *United States v. Vasquez*, 766 F.3d 373, 377 (5th Cir. 2014) (citations and internal quotation marks omitted), *cert. denied*, 135 S. Ct. 1453 (2014).

To prove health care fraud in violation of 18 U.S.C. § 1347(a), the Government was required to show that Mahmood either (1) knowingly and willfully executed, or attempted to execute, a scheme or artifice to defraud a health care benefit program, or (2) knowingly and willfully executed, or attempted to execute, a scheme or artifice to obtain, by means of false or fraudulent pretenses, money under the control of a health care benefit program.[4] *See United States v. Umawa Oke Imo*, 739 F.3d 226, 235–36 (5th Cir. 2014) (citing 18 U.S.C. § 1347). Under either theory, the Government also had to prove that Mahmood's scheme occurred "in connection with the delivery of or payment for health care benefits, items, or services." *Id.* (quoting 18 U.S.C. § 1347(a)).

Mahmood does not dispute that Medicare is a health care benefit program or that his alleged scheme, if proven, occurred in connection with the delivery of health care benefits or services. Rather, he argues that the trial evidence was insufficient to support his convictions because the Government never attempted to prove that the Medicare claims, though resequenced, were false, or that the patient's medical records did not support the resequencing.[5]

---

[4] The superseding indictment also alleged that Mahmood aided and abetted others in committing health care fraud. In light of the evidence that Mahmood directed a scheme to cheat Medicare, we need not address the alternative aiding-and-abetting theory.

[5] Mahmood also makes much of the fact that, for one patient named in the superseding indictment, Mahmood's resequencing resulted in an underpayment, meaning that his hospital received less money than it would have had he not altered Medicare claim forms. Mahmood cites no case from this circuit, or elsewhere, holding that a defendant must have been successful in defrauding a health care benefit program in order to commit health care fraud. Such a requirement would be inconsistent with the plain language of the statute, which requires only that Mahmood have executed a scheme with the intent to defraud Medicare. Indeed, the district court instructed the jury that it was "not necessary that the

No. 15-40521

Mahmood's argument focuses exclusively on the "false or fraudulent pretenses" theory of health care fraud in 18 U.S.C. § 1347(a)(2), and ignores the Government's overwhelming evidence that he knowingly and willfully executed a scheme to defraud Medicare in violation of § 1347(a)(1).

The court instructed the jury that executing a scheme to defraud Medicare means "to engage in a plan, pattern, or course of action intended to deprive Medicare . . . of money or property with the intent to deceive or cheat Medicare." Mahmood did not object to this instruction, and he does not challenge it on appeal. The Government offered substantial evidence of Mahmood's plan to cheat Medicare. Mahmood's own trial evidence reflected that proper coding or recoding of Medicare claims could not be done absent study of a patient's medical record.[6] Yet, for over six years, and at numerous hospitals, Mahmood directed his employees to ignore medical records and to change primary diagnosis codes to reflect acute and chronic conditions that triggered higher Medicare reimbursements but that were unsupported by patients' medical records. Mahmood had not treated these patients or reviewed their records; rather, the testimony of the Government's witnesses, as corroborated by the faxes obtained during the Government's investigation, established that Mahmood chose these new codes based purely upon the amount of money that he could expect to siphon from Medicare.

A reasonable juror could have relied upon this evidence to find that Mahmood knowingly and willingly executed a plan to cheat Medicare.

---

government prove . . . that the alleged scheme actually succeeded in defrauding anyone." Mahmood did not object to this jury instruction, and he does not challenge it on appeal.

[6] Mahmood's trial counsel repeatedly cross-examined the Government's witnesses based on the following language from Medicare's authoritative coding manual: "The importance of consistent, complete documentation in the medical record cannot be . . . over-emphasized. Without such documentation, accurate coding cannot be achieved. The entire record should be reviewed to determine the specific reason for the encounter and the conditions treated."

Accordingly, the record is not "devoid of evidence" of Mahmood's guilt, *see Vasquez*, 766 F.3d at 377, and we affirm each of his health care fraud convictions.

## II. Aggravated Identity Theft

We next consider Mahmood's challenge to the sufficiency of the evidence on his aggravated identity theft convictions.   Mahmood preserved his sufficiency challenge as to these convictions by orally moving for acquittal at trial.   *See United States v. Thompson*, 811 F.3d 717, 725 (5th Cir. 2016). Accordingly, our review is *de novo.  See id.*  In assessing a preserved "challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence in the light most favorable to the verdict, a rational jury could have found that the evidence established the elements of the offense beyond a reasonable doubt." *United States v. Ollison*, 555 F.3d 152, 158 (5th Cir. 2009) (citation and internal quotation marks omitted).   We draw all reasonable inferences and make all credibility determinations in favor of the verdict.  *See id.*

To establish aggravated identity theft in violation of 18 U.S.C. § 1028A, the Government was required to prove that Mahmood (1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A(c).  *See* 18 U.S.C. § 1028A(a)(1); *see also United States v. Stephens*, 571 F.3d 401, 404–05 (5th Cir. 2009).   Although couched as a challenge to the sufficiency of the evidence, Mahmood's argument that he should not have been convicted of aggravated identity theft is driven entirely by a legal argument, to wit, that the "without lawful authority" element of § 1028A required the Government to prove that he actually stole patients' identifying information.   Assuming § 1028A requires actual theft, Mahmood argues that the Government failed to carry its burden at trial because the uncontroverted evidence showed that

patients named in the indictment consented to the sharing of their information for billing purposes.

Mahmood's argument presents an issue of first impression in this circuit—whether actual theft or misappropriation of a person's "means of identification" is required to satisfy the "without lawful authority" element of aggravated identity theft proscribed in 18 U.S.C. § 1028A(a)(1). Though our slate is blank, we are not without guidance from other circuits—as the Ninth Circuit recently recognized, our sister circuits have rejected the argument that § 1028A requires actual theft or misappropriation. *See United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185 (9th Cir. 2015) (per curiam) (collecting cases from a number of circuits), *cert. denied*, 136 S. Ct. 283 (2015); *see also United States v. Soto-Mateo*, 799 F.3d 117, 123 (1st Cir. 2015), *cert. denied*, No. 15-7876, 2016 WL 361645 (Feb. 29, 2016). Today, we join the circuit trend, and hold that § 1028A does not require actual theft or misappropriation of a person's means of identification as an element of aggravated identity theft. Rather, the statute plainly criminalizes situations where a defendant gains lawful possession of a person's means of identification but proceeds to use that identification unlawfully and beyond the scope of permission granted. *See, e.g.*, *id.*; *United States v. Reynolds*, 710 F.3d 434, 436 (D.C. Cir. 2013).

In interpreting § 1028A, we begin with the plain language of the statute, and end there if the text is unambiguous. *See, e.g.*, *United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015). By its plain terms, § 1028A criminalizes the use of a means of identification "without lawful authority." *See* 18 U.S.C. § 1028A(a)(1) ("Whoever, during and in relation to any felony violation enumerated . . . knowingly transfers, possesses, or uses, *without lawful authority*, a means of identification of another person shall . . . be sentenced to a term of imprisonment of 2 years." (emphasis added)). At the time of Mahmood's convictions, Black's Law Dictionary defined "lawful" as "[n]ot

contrary to law" and defined "authority" as "[t]he right or permission to act legally on another's behalf." Black's Law Dictionary 152 & 965 (9th ed. 2009). Combining these two definitions, "§ 1028A(a)(1) reasonably proscribes the . . . use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law." *Osuna-Alvarez*, 788 F.3d at 1185 (quoting *United States v. Ozuna-Cabrera*, 663 F.3d 496, 499 (1st Cir. 2011)). Stated otherwise, § 1028A(a)(1) "easily encompasses situations in which a defendant gains access to identity information legitimately but then uses it illegitimately—in excess of the authority granted." *Reynolds*, 710 F.3d at 436.

Because the plain language of § 1028A unambiguously criminalizes a wider array of conduct than actual theft, we need not resort to traditional canons of statutory interpretation[7] or legislative history to further discern Congress' intent. *See Kaluza*, 780 F.3d at 658. However, Mahmood makes two additional arguments that warrant discussion. First, Mahmood argues that, regardless of the circuit trend and the plain language of § 1028A, the district court instructed the jury as if actual theft was required. This argument misstates the district court's jury instructions. The court instructed the jury that "[t]he phrase 'without lawful authority' means that the Defendant used another's means of identification without that person's permission . . . or

---

[7] Mahmood argues, *inter alia*, that our interpretation of the plain meaning of "without lawful authority" as broader than actual theft renders element four of § 1028A—that the use occur during and in relation to a predicate felony—meaningless. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). We find the Eleventh Circuit's and the Fourth Circuit's rejection of this argument to be persuasive. *See United States v. Kasenge*, 660 F.3d 537, 541 (11th Cir. 2011) ("It takes little imagination to conceive instances in which a person might transfer, possess, or use another person's means of identification, during and in relation to a predicate offense, in a manner that is lawfully authorized."); *United States v. Abdelshafi*, 592 F.3d 602, 609 & n.6 (4th Cir. 2010).

having obtained that person's permission illegally."    This instruction makes no mention of actual theft as a required element of § 1028A.

Second, Mahmood invites the court to follow the Seventh Circuit's en banc decision in *United States v. Spears*, 729 F.3d 753 (7th Cir. 2013), and read the "without lawful authority" element of § 1028A as requiring actual theft. Mahmood's reliance on *Spears* is misplaced.  In *Spears*, the defendant was convicted of five felonies, including aggravated identity theft, after he made a counterfeit handgun permit for a third party who was awaiting trial for a drug charge and therefore could not lawfully obtain such a permit.  *Spears*, 729 F.3d at 754.  In that counterfeit permit, the defendant used the third party's actual name and birthdate. *Id.*

On rehearing, the defendant conceded that he lacked "lawful authority" to transfer the counterfeit permit; instead, he argued, *inter alia*, that he did not transfer a means of identification to "another person" within the meaning of § 1028A because the transferred permit used the third party's actual name and birth date such that "no information was stolen from, or transferred to, anyone who did not consent." *Id.* at 755.  The Seventh Circuit agreed, holding that the phrase "another person" in § 1028A requires the presence of "a person who did not consent to the use of the 'means of identification.'" *Id.* at 758.  As the court noted, "[p]roviding a client with a bogus credential containing the client's own information is identity *fraud* but not identity *theft*; no one's identity has been stolen or misappropriated." *Id.* at 756.

Mahmood essentially asks that we interpret the "without lawful authority" element of § 1028A in the same manner that the Seventh Circuit read "another person" in *Spears*.  We decline.  *Spears* is purposefully silent as to the meaning of "without lawful authority," as that element was conceded on rehearing. *See id.* at 755.  The Seventh Circuit expressly limited its holding and discussion to the meaning of "another person," and one other circuit has

since cited *Spears* as consistent with the universal trend rejecting the argument that the "without lawful authority" element of § 1028A requires actual theft. *See Osuna-Alvarez*, 788 F.3d at 1185.

Even assuming *arguendo* that *Spears* should somehow influence our interpretation of the "without lawful authority" element, the Seventh Circuit's reasoning would still be inapplicable here. As district courts have aptly noted, the core reasoning of *Spears* centers on the Seventh Circuit's understanding that a § 1028A crime must affect real, ascertainable victims. *See United States v. Cwibeker*, No. 12-CR-0632 (JS)(ARL), 2015 WL 459315, at *5 (E.D.N.Y. Feb 2, 2015) ("Unlike *Spears*, the individuals whose identities Defendant allegedly used to submit false Medicare claims were not co-conspirators; they were victims. Their information—though perhaps lawfully obtained at the outset— was allegedly misappropriated by Defendant for his own gain. The presence of real, ascertainable, and immediate victims renders the core reasoning behind the court's decision in *Spears* patently inapplicable here."); *United States v. McDonald*, No. 6:14-CR-10033-JTM, 2014 WL 4071697, at *4 (D. Kan. Aug. 18, 2014) (similar). Here, Mahmood clearly used the identifying information of real, non-complicit patients in executing his scheme to defraud Medicare. Thus, contrary to Mahmood's argument, nothing that we could arguably glean from *Spears* would affect his aggravated identity theft convictions.

In sum, nothing in the plain language of § 1028A indicates that Mahmood must have actually stolen his patients' means of identification in order to be convicted of aggravated identity theft. Rather, the statute plainly applies to circumstances like these, where Mahmood gained access to his patients' identifying information lawfully, but then proceeded to use that information unlawfully and in excess of his patients' permission. *See, e.g.*, *Osuna-Alvarez*, 788 F.3d at 1185–86; *see also Abdelshafi*, 592 F.3d at 609 ("While [the defendant] had authority to possess the Medicaid identification

numbers, he had *no* authority to use them unlawfully so as to perpetuate a fraud."). Because there was no evidence at trial that Mahmood had consent to use his patients' identifying information to commit health care fraud, we affirm each of his aggravated identity theft convictions.

### III. Motion for New Trial

Sufficiency challenges aside, Mahmood next argues that the district court erred in denying his motion for new trial without first holding an evidentiary hearing to consider the merits of his ineffective assistance claim. We review the district court's denial of Mahmood's motion for new trial, as well as the court's decision not to hold an evidentiary hearing, for abuse of discretion. *See United States v. Bishop*, 629 F.3d 462, 469–70 (5th Cir. 2010).

### A.

Federal Rule of Criminal Procedure 33(a), provides, *inter alia*, that a district court may grant a new trial in the interest of justice. *See United States v. Poole*, 735 F.3d 269, 272 (5th Cir. 2013) (citing Fed R. Crim. P. 33(a)). We have stressed that motions for new trial are generally disfavored, *see United States v. Eghobor*, 812 F.3d 352, 363 (5th Cir. 2015), and that district courts have wide discretion with respect to Rule 33 motions, *see United States v. MMR Corp.*, 954 F.2d 1040, 1047 (5th Cir. 1992) (citing *United States v. Simmons*, 714 F.2d 29, 31 (5th Cir. 1983)).

"The law of this circuit is well established that a motion for new trial may ordinarily be decided upon affidavits without an evidentiary hearing." *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977) (citing *United States v. Curry*, 497 F.2d 99 (5th Cir. 1974); *see also Simmons*, 714 F.2d at 30 ("A motion for a new trial can ordinarily be ruled upon without conducting an evidentiary hearing."). "Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering,

prosecutorial misconduct, or third party confession." *Hamilton*, 559 F.2d at 1373; *see also MMR Corp.*, 954 F.2d at 1046.

Mahmood's Rule 33 motion was predicated upon an argument that his trial counsel rendered ineffective assistance. We analyze ineffective assistance of counsel claims using the two-prong inquiry articulated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the *Strickland* standard, Mahmood must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced Mahmood's defense, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result [at trial] would have been different." 466 U.S. at 687, 694. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks and citation omitted).

**B.**

In his motion for new trial, Mahmood argued that trial counsel rendered ineffective assistance by failing to solicit testimony from Melnykovych and Pelton, two experts who had reviewed the medical records of the patients named in the indictment, and who would have testified that: (1) changes to Longley's initial coding were medically justified, *i.e.*, the claims submitted to Medicare were accurate and supported by patients' medical records; and (2) Mahmood's resequencing of codes without reviewing patients' medical records was "not inherently wrong or improper." In support of these arguments, Mahmood attached an expert report drafted by Melnykovych and Pelton, as well as an affidavit from Melnykovych. On appeal, Mahmood contends that the district court's failure to hold an evidentiary hearing to investigate the

experts' testimony and trial counsel's performance constituted an abuse of discretion. We disagree.

None of the unsolicited expert testimony advanced by Mahmood implicates the unique situations noted in *Hamilton*, in which evidentiary hearings are commonly necessary. *See Hamilton*, 559 F.2d at 1373; *see also United States v. Fields*, 58 F. App'x 597, 2003 WL 261874, at *2 (5th Cir. Jan. 24, 2003) (unpublished table decision) (citing *Hamilton* and affirming the denial of a Rule 33 motion without a hearing where the defendant did "not demonstrate[] that his situation was sufficiently unique to warrant an evidentiary hearing"). More telling, most of the potential testimony would not have bolstered Mahmood's defense. The gist of the experts' report and Melnykovych's affidavit is that Mahmood's resequencing of Medicare claims was accurate in light of the conditions and diagnoses documented in patients' medical records. However, as discussed *supra*, Mahmood's convictions are predicated on the trial evidence establishing that he never reviewed a single patient's medical record in this case; rather, he directed his employees to disregard such records and code acute and chronic conditions based solely on how much money Medicare would reimburse his hospitals.

In light of Mahmood's failure to review any medical records, the experts' post-hoc review of those records does not exculpate Mahmood from the jury's verdict that he executed a scheme to defraud Medicare. Trial counsel certainly was not ineffective for failing to present non-exculpatory expert evidence to the jury,[8] *cf. United States v. Logan*, 861 F.2d 859, 864 (5th Cir. 1988), just as

---

[8] In his brief, Mahmood cites a line of habeas cases for the proposition that "[n]umerous federal courts have held that the failure to employ an expert may constitute constitutionally ineffective assistance." *See, e.g.*, *Williams v. Thaler*, 684 F.3d 597, 604–05 (5th Cir. 2012) (considering whether counsel's failure to obtain certain expert reports could satisfy the *Strickland* standard). In these cases, the unsolicited expert testimony could have exculpated the defendant, *see, e.g.*, *Showers v. Beard*, 635 F.3d 625, 632 (3d Cir. 2011), or

No. 15-40521

allowing new counsel an evidentiary hearing to explore such non-exculpatory testimony would have been an exercise in futility, *cf. Eghobor*, 812 F.3d at 364 (affirming the denial of a Rule 33 motion where a defendant failed to explain how evidence "could probably produce an acquittal").

Mahmood also argues that trial counsel was ineffective for failing to offer the experts' alleged testimony that his resequencing of diagnosis codes without reviewing patients' medical records was not improper. Although Mahmood highlighted this argument in his appellate brief, his briefs below, and a post-oral argument Rule 28(j) letter, he cites no portion of his expert proffer in which one of the experts testified to a specific circumstance where medical coding could be completed absent some review of a patient's medical record. Indeed, the experts' analysis of the medical records mentions no such circumstances,[9] and Melnykovych's affidavit references no such specific circumstances.[10] The

---

minimally made the defense stronger or the government's case more difficult to prove, *see, e.g.*, *Thaler*, 684 F.3d at 604–05. The circumstances here are distinguishable. Because Mahmood never reviewed patients' medical records, the experts' testimony about what those records show is irrelevant on the question of whether Mahmood executed a plan to cheat Medicare.

[9] The experts' report only sparingly refers to appropriate coding practices. As to patient A.G., the report mentions that "[c]oding guidelines allow for the optimization of [code] assignment when two or more diagnoses are equally treated during the hospitalization and present on admission" and, as to patient J.W., the report mentions that an individual reviewing a specific page of the medical record would have correctly changed J.W.'s primary diagnosis. Neither of these references purport to state or imply that changes to medical coding can be completed absent review of some portion of a patient's medical record.

[10] In her affidavit, Melnykovych testifies that "[t]here are occasions that a coder, by referencing the initial sequence of codes, may properly re-sequence those codes, *provided that the initial coding determinations were made after a review of the patient's entire medical record*" (emphasis in original). In making this conclusory pronouncement, Melnykovych identifies no such occasions. Melnykovych also testifies that "[i]n the case where there may be more than one viable principal diagnosis code and *correct coding rules and conventions have been applied in arriving at proper code assignment* . . . the coder may re-order the viable principal diagnosis codes to determine and assign the code as the principal diagnosis which would result in the highest [Medicare reimbursement]" (emphasis in original). However, one such proper coding convention that Melnykovych attests to is a coder's review of the clinical record.

19

district court did not abuse its wide discretion in declining to credit Mahmood's conclusory assertions in his briefs, particularly given that Mahmood's own trial evidence suggested that coding of a patient's principal diagnosis could not be completed without review of the medical record. *See, e.g.*, *United States v. Reed*, 719 F.3d 369, 373 (5th Cir. 2013) ('Conclusory allegations, unsubstantiated by evidence, do not support the request for an evidentiary hearing.").

Having carefully considered the briefing and the record below, we conclude that Mahmood's arguments rest on either non-exculpatory testimony or conclusory assertions, neither of which is sufficient to show that the district court abused its discretion in denying his motion without an evidentiary hearing. Accordingly, we affirm the district court's denial of Mahmood's motion for new trial.

## IV. Loss Calculation

This brings us to the first of several of Mahmood's arguments related to the district court's sentencing determinations. It is undisputed that at sentencing the district court sustained, in part, Mahmood's objection and reduced the PSR's calculation of the total loss suffered by the victims of his fraud to $599,128.02. Consistent with his objection below, Mahmood now argues that the district court erred in refusing to go one step further and credit him for the fair market value of services that his hospitals rendered to patients. We agree.

"Though we review a sentence for abuse of discretion, we review the district court's application of the guidelines *de novo* and its findings of fact at sentencing for clear error." *United States v. Klein*, 543 F.3d 206, 213 (5th Cir. 2008) (internal citations omitted). The district court's loss calculation is generally a factual finding that we review for clear error. *See id.* at 214.

However, we review "*de novo* how the court calculated the loss, because that is an application of the guidelines, which is a question of law." *Id.*

Generally, U.S.S.G. § 2B1.1(b)(1) provides that the amount of loss resulting from a crime involving fraud is a specific offense characteristic that increases a defendant's base offense level. *See, e.g., United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011). Pertinent here, a sentencing "court need only make a reasonable estimate of the loss." *See* U.S.S.G. § 2B1.1 comment. (n.3(C)). However, the amount of loss must account for "the fair market value of the . . . services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." *Id.* § 2B1.1 comment. (n.3(E)(i)).

Two cases guide our analysis of Mahmood's arguments: *United States v. Klein*, 543 F.3d 206 (5th Cir. 2008), and *United States v. Jones*, 664 F.3d 966 (5th Cir. 2011). In *Klein*, the defendant was a physician who committed health care fraud in several ways, including submitting claims for in-office administration of certain medications when, in fact, patients were self-administering those medications at home. *See* 543 F.3d at 208–09. In calculating the total loss inflicted by the defendant's fraud, the district court totaled the face amount that the defendant billed to insurance companies for the in-office visits without crediting the defendant for the value of the medications that patients self-administered on those dates. *See id.* at 209, 213–14. We held that this was error—even though the defendant fraudulently billed services related to the medications, neither party disputed that the patients needed those medications or that the insurance companies would have had to pay for the medications had the defendant not fraudulently billed them. *Id.* We therefore vacated the defendant's sentence and remanded for the district court to recalculate the loss considering the fair market value of the

medications pursuant to U.S.S.G.§ 2B1.1 comment. (n.3(E)(i)).  *See id*. at 214–15.

By contrast, we reached a different result on the facts of *Jones*.  There, the defendants billed Medicare for the provision of certain services, fraudulently misrepresenting that licensed professionals had rendered those services.  *See Jones*, 664 F.3d at 971–72, 984.  The district court calculated the loss amount without crediting the defendants for the alleged value of the services.  *See id*. at 984.  We affirmed based on the district court's factual finding that the services "had no monetary value insofar as the Medicare and Medicaid laws are concerned."  *Id*.  As a preliminary matter, we held that Medicare, not the defendants' patients, was the victim of the defendants' fraud for purposes of the fair-market-value credit in U.S.S.G. 2B1.1 comment. (n.3(E)(i)).  *See id*.  Having identified Medicare as the appropriate victim, we concluded that "Medicare pays for treatments that meet it standards" and that the defendants' treatments using unlicensed personnel did not meet those standards.  *See id*.  Consequently, Medicare received no value from the unlicensed treatment and the district court did not err in refusing to consider the fair market value of those treatments in calculating the loss amount.  *See id*.

Together, *Klein*, *Jones*, and their progeny illuminate the path we take to resolve the particular issues in this case.  We must consider that Medicare is the victim of Mahmood's fraud and that Medicare receives "value" within the meaning of U.S.S.G. § 2B1.1 comment. (n.3(E)(i)) when its beneficiaries receive legitimate health care services for which Medicare would pay but for a fraud.  *See Jones*, 664 F.3d at 984; *Klein*, 543 F.3d at 213–14.  Thus, if as in *Klein*, Medicare would have paid for the services that Mahmood's hospitals rendered to patients but for Mahmood's fraudulent billing, then Mahmood is entitled to a credit for the fair market value of those services.  *See Klein*, 543 F.3d at 213–

14. By contrast, if as in *Jones*, Medicare would not have paid for the services that Mahmood's hospitals rendered to patients, then Mahmood is entitled to no such credit.  *See Jones*, 664 F.3d at 984.  We must consider that Mahmood bore the burden to proffer evidence that the services that his hospitals rendered to patients were legitimate and that Medicare would have paid for those services but for his fraud.  *See United States v. Echols*, 574 F. App'x 350, 360–61 (5th Cir. 2014) (distinguishing *Klein* where the defendant failed to proffer "evidence that legitimate medical services were actually provided to any . . . patients").  However, we must also be cognizant of the fact that the Government cannot rebut Mahmood's proffer merely relying on "unsubstantiated claims that particular health care services were not rendered."  *See United States v. Martin*, 555 F. App'x 358, 369 (5th Cir. 2014) (affirmatively citing *Jones* and affirming the denial of a credit where the case was not one "in which the government's proposed loss calculation was based on unsubstantiated claims that particular health care services were not rendered").

We hold that Mahmood carried his burden at sentencing to show that his hospitals rendered legitimate services to patients and that Medicare would have paid substantial sums for those services had he not fraudulently billed them.  At trial, the Government's entire theory of Mahmood's guilt was that coders at his hospitals accurately coded Medicare claims and that these claims were tainted only when Mahmood fraudulently switched the order of diagnosis codes on the claims.  The Government's own expert "priced" the eighty-five identified claims and testified that Medicare would have reimbursed Mahmood's hospitals $430,639 if the claims had been submitted without

Mahmood's fraud. [11] Mahmood pointed to this "pricing" evidence at sentencing, and the Government proffered no rebuttal evidence tending to suggest that Medicare would not have paid for the services underlying the expert's pricing calculation or that the services were not actually provided. Absent such contrary evidence, the district court's refusal, without explanation, to credit Mahmood for the $430,639 that Medicare would have reimbursed his hospitals but for his fraud was a legally unacceptable method of calculating the loss. *See Klein*, 543 U.S. at 213–15 (applying U.S.S.G. § 2B1.1 comment. (n.3(E)(i))).

The Government cites *Jones* and argues that we should affirm the district court because Medicare is the victim of Mahmood's fraud for purposes of U.S.S.G. § 2B1.1 comment. (n.3(E)(i)), and Mahmood's hospitals provided services to patients, not Medicare. The Government overstates *Jones*.

As discussed *supra*, the district court here made no factual finding akin to that made in *Jones* indicating that the services rendered to Mahmood's hospitals were of no value to Medicare. *See Jones*, 664 F.3d at 984. Moreover, *Jones* does not require that we read § 2B1.1 comment. (n.3(E)(i)) as precluding a credit merely because health care services were provided to patients, not

---

[11] In its brief, the Government argues that "Mahmood cannot point to any evidence in the record to support his contention that services were actually provided" or "any evidence in the record concerning the fair market value of the services purportedly provided." This argument boldly ignores Mahmood's reliance at sentencing on the Government's own trial evidence to show that his hospitals actually rendered services to patients and that the value of these services was $430,639. We appreciate that, at times during the trial, the Government's expert did refer to his pricing determinations as "hypothetical" reimbursements. However, the Government's argument remains quite contradictory—on the one hand, the Government asks that we consider its pricing evidence as accurate and reliable to show Mahmood's guilt at trial; yet, on the other, the Government asks that we consider the same evidence unreliable, inaccurate, or incomplete in applying the Sentencing Guidelines for reasons that the Government did not explain to the district court and has not explained on appeal. At bottom, the Government's argument remains nothing more than "unsubstantiated claims that particular health care services were not rendered," which are insufficient to show that Mahmood is not entitled to a fair-market-value credit. *See Martin*, 555 F. App'x at 369.

Medicare. Indeed, such a reading would preclude a credit in any health care fraud case implicating Medicare. Medicare is not a patient; as such, it never receives "value" as does a patient when he or she receives treatments and procedures from a health care provider. Rather, *Jones* instructs that Medicare, as an insurance organization, receives "value" when its beneficiaries receive legitimate health care services for which Medicare is obligated to pay but for a fraud. *See Jones*, 664 F.3d at 984; *see also Klein*, 543 F.3d at 213–15. As discussed *supra*, the only available evidence indicates that Medicare beneficiaries at Mahmood's hospitals did receive such legitimate services. The services only became "illegitimate" sometime after the fact when Mahmood fraudulently billed them to Medicare.[12] Under such circumstances, and consistent with *Jones*, § 2B1.1 comment. (n.3(E)(i)) entitles Mahmood to a credit against loss.

The Government also contends that Mahmood is not entitled to a credit because his fraud was pervasive and difficult to detect. Implicit in this argument is that the district court's loss calculation did not capture the full extent of Mahmood's fraud and possibly even underestimated the impact of Mahmood's fraud. Similar to the situation in *Klein*, the district court was certainly free to make a factual finding that Mahmood's fraud was pervasive or that the $599,128.02 loss figure underestimated the victims' actual loss for any number of reasons. *See Klein*, 543 F.3d at 214. But, no such factual finding

---

[12] The Government also argues that Mahmood is not entitled to a credit because he violated one of Medicare's conditions of payment that requires compliance with "Medicare laws, regulations and program instructions that apply to th[e] provider." Such a condition of payment was not the type of treatment standard that rendered health care services illegitimate in *Jones*. *See* 664 F.3d at 971–72, 984.

was made by the court.[13]  Accordingly, these arguments are not relevant in this appeal.

All said, based on the record at sentencing, the Guidelines and *Klein* required the district court to credit Mahmood for the fair market value of legitimate health care services that his hospitals rendered to patients.  The district court's failure to do so was a procedural error and an abuse of discretion.  *See Klein*, 543 F.3d at 214–15.  Because this procedural error affected the applicable Guidelines-sentencing range on Mahmood's conspiracy and health care fraud convictions, we vacate the sentence imposed on those convictions and remand for resentencing.

## V. Restitution

Mahmood next challenges the district court's restitution order.  He argues that the district court made the same error in imposing the amount of restitution as it did in calculating the loss amount, *i.e.*, that restitution should have been offset by the value of the services that his hospitals rendered to patients.  We agree.

Mahmood preserved his objection to the district court's restitution order by objecting at sentencing.  Accordingly, we review the legality of the restitution award *de novo*, "and if the award is legally permitted, we review the amount for abuse of discretion." *Id.* at 215.  "An order of restitution will be reversed on appeal only when the defendant shows that it is probable that the court failed to consider a mandatory factor and the failure to consider the mandatory factor influenced the court." *Id.* (quoting *United States v. Reese*, 998 F.2d 1275, 1280–81 (5th Cir. 1993)).

---

[13] In considering the § 3553(a) factors, the district court did note one witness' trial testimony that Mahmood's fraud began as early as 2005.  However, the court made no factual finding related to conduct beginning in 2005 in calculating the loss amount.

No. 15-40521

The court ordered Mahmood to pay $599,128.02 in restitution pursuant to the MVRA. "'The MVRA authorizes restitution to a victim directly and proximately harmed by a defendant's offense of conviction' but 'limits restitution to the *actual loss* directly and proximately caused by the defendant's offense of conviction.'" *Echols*, 574 F. App'x at 359 (emphasis added) (quoting *United States v. Sharma*, 703 F.3d 318, 322–23 (5th Cir. 2012)). "[I]n health care-fraud cases, an insurer's *actual loss* for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud." *Sharma*, 703 F.3d at 324. The MVRA places the burden on the Government to prove a victim's actual loss. *See* 18 U.S.C. § 3664(e). However, the sentencing court may shift that burden to the defendant as justice requires. *See Sharma*, 703 F.3d at 325–26 (citing 18 U.S.C. § 3664(e)).

Even assuming Mahmood had the burden to show the victims' actual loss, we hold that he carried that burden. As discussed *supra*, at sentencing, Mahmood relied upon the Government's own valuation of the services rendered to patients at his hospitals, which indicated that Medicare would have reimbursed the hospitals all but $143,608. Absent evidence to the contrary, the failure to consider this amount as the victims' actual loss was an abuse of discretion. *See, e.g.*, *Klein*, 543 F.3d at 215. Accordingly, we vacate the restitution order and remand for the district court to reconsider the victims' loss.

## VI. Substantive Reasonableness

Mahmood's final challenge is to the substantive reasonableness of his sentence. Specifically, he argues that the district court abused its discretion in imposing the sentence on his aggravated identity theft convictions. We need not reach this issue. In considering an appropriate sentence on the aggravated identity theft convictions, the district court considered, *inter alia*, "the financial

No. 15-40521

loss borne by the United States taxpayers." As discussed *supra*, the district court erred in calculating the loss caused by Mahmood's fraud. Accordingly, we vacate the sentence imposed on Mahmood's aggravated identity theft convictions, and remand for the district court to resentence Mahmood on those convictions after recalculating the loss.

## CONCLUSION

In summary, we AFFIRM in part, and VACATE and REMAND in part. We AFFIRM each of Mahmood's health care fraud convictions, each of his aggravated identity theft convictions, and the district court's denial of his motion for new trial. We VACATE Mahmood's sentence in total and the district court's restitution order, and REMAND for resentencing.