# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30998

United States Court of Appeals
Fifth Circuit

**FILED**

February 15, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

LOUIS W. CARBINS, JR.,

Defendant – Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

Before DAVIS, HAYNES, and COSTA, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Following a jury trial, Louis W. Carbins, Jr., was convicted of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, seven counts of aiding and abetting theft of Government money in violation of 18 U.S.C. §§ 2 and 641, and one count of aiding and abetting aggravated identity theft in violation of 18 U.S.C. §§ 2 and 1028A. Carbins challenges the sufficiency of the evidence supporting his conviction for aiding and abetting aggravated identity theft, which carries a mandatory consecutive two-year prison term. Concluding that the evidence was sufficient to support Carbins' conviction, we AFFIRM.

No. 16-30998

**I.**

The indictment charged that Carbins, along with co-defendant, Laphrida T. Watts, conspired to defraud the Internal Revenue Service ("IRS") by obtaining fraudulent tax refunds to which they were not entitled (Count 1), converted those unlawfully obtained IRS refunds which were issued in the names of various "identity victims" to their own use and the use of another (Counts 2 through 8), and, during and in relation to their theft of the IRS refunds, knowingly used without lawful authority the names and social security numbers of the various "identity victims." (Count 9). Watts ultimately entered into a plea agreement with the Government, pleading guilty to conspiracy to defraud the United States (Count 1) and aiding and abetting aggravated identity theft (Count 9). She testified for the Government at Carbins' trial.

Watts testified that she started a romantic relationship with Carbins in November of 2012. Around this time, Watts was communicating with people on the internet about "different types of jobs." Specifically, the people on the internet were discussing a "bank drop," which Watts explained was a "wire transfer or someone walking in and putting money into your [bank] account."

An internet contact by the name of "Documentation" or "Doc" asked Watts if she had a bank account in which bank drops could be made. Watts communicated with Doc using an "app" called ICQ, through instant messaging, or by calling him on a computer line. When Watts informed Doc that she did not have a bank account, Doc asked if she knew anyone who did. During one of Watts' online conversations with Doc, Carbins saw Watts communicating with Doc. At that point, Carbins asked Watts what a bank drop was.

Watts explained that a bank drop involved someone wiring money into a bank account. In order for a bank drop to occur, she explained, the account holder would have to give his personal bank account information to the person

2

wiring the money. After hearing Watts' description of a bank drop, Carbins "said he wanted to do it." Watts informed Doc that she "found someone" for the bank drops.

Carbins himself then began communicating with Doc over ICQ, instant messaging, and e-mail, as well as on his cellphone. Carbins gave Doc the information regarding an existing bank account he had at Regions Bank. Carbins also opened a second bank account at Regions and additional bank accounts at Bank of America, Teche Federal Bank, MidSouth Bank, Whitney Bank, and Patterson State Bank. After Carbins established the bank accounts, he created online account access and gave Doc the necessary information so that Doc too could access the account information online, "as if he were the account holder."

Watts testified that two or three days prior to a bank drop being made into one of Carbins' accounts, Doc sent an e-mail showing a "breakdown" of the amount of money he was to receive from the drop and the amount Carbins was to receive. Doc would always receive 50 percent of the drop. The other 50 percent would be split between Carbins and another person responsible for wiring Doc's percentage to whatever name Doc provided in his e-mail. Watts testified that the names of the individuals Doc instructed them to wire the money to were "really crazy" and that the addresses were mostly located in Ukraine. In many cases, Carbins and Watts would go to a MoneyGram located inside a Wal-Mart store in order to wire the money to the name indicated in Doc's e-mail. Watts testified that in the beginning of the scheme, she and Carbins did not know the money being deposited into Carbins' bank accounts was "IRS money." Watts believed, and told Carbins, that the money was "illegal money" and was "probably coming from somebody that owed [Doc] money for drugs or something else."

No. 16-30998

The evidence admitted at trial included the bank statements from Carbins' various bank accounts.  The statements reflected that the first bank drop in the amount of $7,695 hit Carbins' original account at Regions on March 5, 2013.  The bank statement described this deposit as follows: "US Treasury 312  Tax Ref Gowdy, David &."  The bank statement further indicated that, on the same day the deposit entered Carbins' account, withdrawals of $2,499 and $2,415, listed as purchases from Wal-Mart, were made from the account.

The second bank drop in the amount of $7,183 entered Carbins' account at Bank of America on March 6, 2013.  The bank statement from that account described this deposit as follows:  "US Treasury 312 Des: Tax Ref ID:Xxxxxxxxx IRS Indn: White, Forrest & Marie Co ID:3111036170 Ppd."  The statement further indicated that on March 28, 2013, a withdrawal of $2,502.10, listed as a purchase from Wal-Mart, was made from the account.

The third bank drop in the amount of $8,878 hit Carbins' original account at Regions on March 20, 2013.  The bank statement from that account described this deposit as follows:  "US Treasury 312 Tax Ref Edmonds, Micha."  The bank statement further indicated that on the same date as the deposit, withdrawals of $2,950 and $1,999, listed as purchases from Wal-Mart, were made from the account.

The fourth bank drop in the amount of $7,671 entered Carbins' additional account at Regions on April 11, 2013, and was described in the bank statement as follows:  "US Treasury 312 Tax Ref Heinen, Dennis."  The fifth bank drop in the amount of $174,937 was made into Carbins' account at Patterson State Bank on April 24, 2013, and was described in the bank statement as follows:  "AC-US TREASURY 312 – TAX REF."  The sixth and final bank drop in the amount of $516,091.45 entered Carbins' account at

4

No. 16-30998

Teche Federal Bank on July 3, 2013, and was described in the bank statement as follows: "US Treasury 312 TAX REF XXXXX2781 IRS."

Watts testified that the first time she and Carbins encountered any problems with the bank drops was on April 25, 2013, the day after the fifth bank drop, when a detective called Carbins regarding his account at Patterson State Bank. The detective wanted to see Carbins, and Carbins "had no choice" but to meet him. Watts testified that when Carbins returned from the meeting, "that's when we actually knew the money was really [from the] IRS, because from what we understood, Doc could make it look like it was an IRS check."

Rose Cope, a vice president at Patterson State Bank, testified that on April 25, 2013, she became aware of an issue with Carbins' account at the bank. Specifically, the account reflected a tax refund deposit from the IRS of $174,934, but the names listed as the payees on the refund check were Daniel and Laura Bair, not Carbins. Cope subsequently called the IRS fraud department, which instructed her to return the entire deposit to the IRS. At that point, Cope learned from bank records that Carbins had already withdrawn $2,611 from the IRS funds. She then froze the account.

Cope testified that next she telephoned Carbins. She "instructed him that a deposit was made into his account that did not belong to him and that we were required to return it[,] and that [she] needed him to immediately return the money that had been withdrawn from the account." She informed Carbins "that the deposit was an IRS refund check." She requested that Carbins come to the bank later that day to return the money he had withdrawn or she would contact the local police department.

Because Carbins never showed up, Cope contacted the Patterson Police Department regarding a "fraudulent deposit" at the bank. Four days later, Carbins went into the bank and met with Cope. She informed him again that an IRS tax refund had been deposited into his account, "that [it] did not belong

5

to him," and that he needed to return the money he had withdrawn on those funds. She further told Carbins that if he did not make arrangements to repay the funds, she would pursue charges against him. Although Carbins did agree to a payment arrangement, only two payments were completed, so that the remaining balance owed to the bank equaled $2,197.

Watts testified that after Carbins' encounter with Patterson State Bank in April 2013, a final bank drop was made into Carbins' account at Teche Federal Bank in July 2013. She and Carbins were not "aware that a drop was coming." They learned about the drop from an e-mail alert sent by the bank, which message indicated that the deposit amounted to over $500,000. Carbins had a debit card for that account, and he went to an automatic teller machine (ATM) to see if he could withdraw any money out of the account. Although they did not think it was possible, Carbins was able to withdraw money from the account. They also went to Best Buy stores in "Lafayette, New Orleans, and a couple of different places" to purchase some iPads, MacBooks, and other items from a list that Doc e-mailed to them. After purchasing these electronics, they mailed them to an address in New York, as instructed by Doc. Carbins also bought a diamond ring for Watts, which she stated she subsequently returned to the jewelry store. Watts testified that in October 2013, she and Carbins ended their relationship.

Eddie Leblanc, who was the chief risk officer at Teche Federal Bank in July 2013, testified that he was notified by the deposit services department that the bank had received "an ACH, which is an electronic transfer type of transaction, [from the IRS] to Mr. Carbins' account in the amount of $516,000 or thereabouts." Leblanc was notified because the name of the recipients on the ACH report, "John and Cristi Ludwig," differed from the account holder, Carbins. The report also contained the Ludwigs' social security numbers, which again differed from Carbins' social security number. Leblanc was also

informed that just under $20,000 had been withdrawn from the account. Concerned that the funds did not actually belong to Carbins, Leblanc froze the account and contacted the IRS.

Leblanc further testified that sometime later, Carbins called him "want[ing] the money that was in the account." Leblanc explained to Carbins that the funds that were deposited into his account were not his and gave Carbins the names of two IRS agents who wanted to speak with him. As instructed by the IRS, Leblanc later closed Carbins' account and remitted the remaining funds to the IRS.

Victoria O'Brien, an IRS employee, testified that the IRS accepts tax returns in both electronic and paper form. Within 24 hours of receiving a return, IRS personnel verify preliminarily the filer's name, Social Security Account Number ("SSAN"), and date of birth to determine if the information matches IRS records and if the SSAN is a valid one. If the SSAN is not valid, the tax return is rejected and diverted to another department for further investigation. If the information appears valid, and the return requests a refund, the Department of the Treasury ("Treasury") then issues a refund by paper check or electronic deposit. If electronic deposit is requested, the Treasury electronically deposits the refund into the bank account provided by the filer on the face of the tax return.

The evidence from the IRS showed that between February 26, 2013, and April 10, 2013, 10 fraudulent joint tax returns were electronically filed with the IRS, apparently by Doc or someone acting at his direction, using a free online computer software program called "Tax Hawk 201201." Some of the real taxpayers who were the victims of the scheme testified that their last names and SSANs on the returns were correct, but other information, such as the amount of income, amount of exemptions or credits, home addresses, and employers' names, was incorrect. The fraudulent returns reflected that tax

refunds in the amount of $7,000 to $9,000 were due to the taxpayers and provided the routing and account numbers of Carbins' various bank accounts for electronic deposits of the refunds. The total refunds requested in the fraudulent tax returns was $81,091, and the total refunds deposited into Carbins' accounts was $722,455.45.

The evidence at trial established that Doc or one of his associates filed two tax returns on February 26, 2013. The first tax return was filed in the name of David and Deborah Gowdy and requested that a refund of $7,695 be directly deposited into Carbins' original bank account at Regions. The second tax return was filed in the name of Forrest White and Marie Rzepka and requested that a refund of $7,183 be directly deposited into Carbins' account at Bank of America. On March 11, 2013, a third tax return was filed in the name of Michael and Lisa Edmonds, requesting that a refund of $8,878 be directly deposited into Carbins' original bank account at Regions.

On April 3, 2013, a tax return was filed in the name of Dennis and Donna Heinen, requesting a refund of $7,671 to be directly deposited into Carbins' second bank account at Regions. On April 5, 2013, a tax return in the name of John and Cristi Ludwig was filed, requesting a refund of $8,745 to be directly deposited into Carbins' bank account at Teche Federal Bank. On April 10, 2013, the last tax return[1] was filed in the name of Daniel and Laura Bair, requesting that a tax refund be directly deposited into Carbins' bank account at Patterson State Bank.

---

[1] Tax returns were also filed on March 22, 2013, April 3, 2013, April 4, 2013, and April 6, 2013, in the names of various taxpayers requesting that refunds be directly deposited into Carbins' bank accounts. However, for various reasons, those returns did not result in any electronic deposits into Carbins' bank accounts.

No. 16-30998

## II.

As he did below, Carbins challenges the sufficiency of the evidence supporting his conviction for aiding and abetting aggravated identity theft under Count 9 of the indictment.  Carbins properly preserved his challenge to the sufficiency of the evidence by orally moving for acquittal, first at the close of the Government's case[2] and again at the close of all of the evidence pursuant to Federal Rule of Criminal Procedure 29(a).  Therefore, our review is de novo.[3] "Though de novo, this review is nevertheless highly deferential to the verdict."[4] Under this standard, "we must determine whether, viewing all the evidence in the light most favorable to the verdict, a rational jury could have found that the evidence established the elements of the offense beyond a reasonable doubt."[5]  Furthermore, we are required to "draw all reasonable inferences and make all credibility determinations in favor of the verdict."[6]  "In other words, a defendant seeking reversal on the basis of insufficient evidence swims upstream."[7]

The aggravated identity theft statute, 18 U.S.C. § 1028A, provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c) knowingly transfers, possesses, or uses, without lawful

---

[2] Carbins moved for acquittal at the close of the Government's case, and the district court reserved ruling on Carbins' motion as to Count 9 at that time.  Under Federal Rule of Criminal Procedure 29(b), "[i]f the [district court] reserves decision [on a motion for a judgment of acquittal], it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Under these circumstances, our "appellate review is [also] limited to the evidence presented in the Government's case-in-chief."  *See United States v. Brown*, 459 F.3d 509, 523 (2006) (citation omitted).  The Government's argument that our review is not so limited runs contrary to the plain language of Rule 29(b) and our application of the rule in *Brown*.

[3] *See United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016).

[4] *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (internal quotation marks and citations omitted).

[5] *Mahmood*, 820 F.3d at 187 (internal quotation marks and citation omitted).

[6] *Id.* (citation omitted).

[7] *Chapman*, 851 F.3d at 376 (internal quotation marks and citation omitted).

authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."[8]  The list of offenses enumerated in subsection (c) of the statute includes theft of Government money in violation of 18 U.S.C. § 641, the crime for which Carbins was convicted under Counts 2 through 8 of the indictment. The aiding and abetting statute, 18 U.S.C. § 2, provides that a person who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal."[9]

The aggravated identity theft statute further provides that "no term of imprisonment imposed on a person under this section shall run concurrently with any other term of imprisonment imposed on the person under any other provision of law."[10]  Thus, the aggravated identity theft statute "imposes a mandatory consecutive 2-year prison term."[11]

To convict Carbins of aggravated identity theft, the Government was required to prove that Carbins "(1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to [his commission of theft of Government money under § 641]."[12]  The term "means of identification" is defined as "*any name* or number that may be used, alone or in conjunction with any other information, *to identify a specific individual.*" [13]  This includes any name, social security number, or date of birth.[14]  The Government was required "to show that [Carbins] knew that the means of identification at issue belonged to another person."[15]  "[A] person is

---

[8] 18 U.S.C. § 1028A(a)(1).
[9] *Id.* § 2(a).
[10] *Id.* § 1028A(b)(2).
[11] *See Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009).
[12] *Mahmood*, 820 F.3d at 187 (citations omitted).
[13] 18 U.S.C. § 1028(d)(7) (emphasis added).
[14] *Id.* § 1028(d)(7)(A).
[15] *Flores-Figueroa*, 556 U.S. at 657.

No. 16-30998

liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission."[16]

Carbins asserts that the record is devoid of any evidence that he had any idea regarding the manner in which Doc caused the IRS to deposit money into his bank accounts. He contends that the mere discovery that the money was coming from the IRS does not allow a permissible inference that he knew such deposits were the result of Doc's misappropriation of the means of identification of real people. Moreover, Carbins argues that even if the knowledge of the source of the money could be deemed sufficient to impute knowledge of the unauthorized use of another person's means of identification, that knowledge came too late in the criminal activity to permit a finding of guilt based on aiding and abetting.

In support of these arguments, Carbins contends that there is no evidence contradicting Watts' testimony that he did not know that the bank drops involved IRS money until after his meeting at Patterson State Bank in late April 2013. However, as the Government contends, Watts also testified that Carbins had online access to his various bank accounts. Watts explained that two or three days prior to a bank drop, Doc sent an e-mail showing a breakdown of the amount of money he and Carbins were to receive from the drop. Consequently, after receiving an e-mail from Doc regarding an impending deposit, Carbins could access his bank account information online to determine when the bank drop hit his account.

---

[16] *Rosemond v. United States*, --- U.S. ---, 134 S. Ct. 1240, 1245 (2014) (citations omitted).

11

No. 16-30998

As detailed above, the bank statements from Carbins' original account at Regions indicated that large withdrawals from Carbins' account[17] occurred the same day the bank drops hit his account. The jury could reasonably infer from these facts that Carbins was accessing his bank account information online. The bank statement describing the first bank drop completed on March 5, 2013, into Carbins' original bank account at Regions provided: "US Treasury 312  Tax Ref Gowdy, David &." The bank statement describing the second bank drop into that account completed on March 20, 2013, provided: "US Treasury 312 Tax Ref Edmonds, Micha." The only other bank drop occurring in March 2013 went to Carbins' bank account at Bank of America. That bank drop was completed on March 6, 2013, and was described in the bank statement as: "US Treasury 312 Des: Tax Ref ID:Xxxxxxxxxx IRS Indn: White, Forrest & Marie Co ID:3111036170 Ppd." A large withdrawal from that account occurred on March 28, 2013.

The jury could reasonably infer that when Carbins accessed his bank accounts online, the online descriptions of the deposits were the same as reflected on the paper bank statements admitted at trial. The descriptions specifically provided that the deposits were from the "US Treasury," contained the terms "Tax Ref," and referred to individual names, "Gowdy, David," "White, Forrest & Marie," and "Edmonds, Micha." The description of the bank drop in Carbins' Bank of America account even contained the acronym "IRS." The jury could reasonably infer that these descriptions of the bank drops put Carbins on notice in March 2013, and certainly before the April 2013 tax returns were

---

[17] The withdrawals were described as purchases from Wal-Mart which is consistent with Watts' testimony that they used the MoneyGram inside Wal-Mart stores to wire money, as instructed by Doc, from the bank drops.

filed, that the money being deposited into his accounts resulted from IRS tax refund checks issued by the U.S. Treasury to the named individuals.[18]

Contrary to Carbins' assertions, the banks' notations regarding the deposits were not cryptic and did not require any "decoding" in order for Watts and Carbins to be put on notice that the deposits were tax refunds from the IRS. Watts' testimony on its own established that the deposits appeared to them to be IRS funds. Specifically, Watts testified that after Carbins' meeting at Patterson State Bank, "that's when [they] *actually* knew the money was *really* [from the] IRS, because from what we understood, Doc could make it *look like it was an IRS check*." As the Government contends, "[t]his court has expanded the definition of knowledge to include circumstances where a defendant exhibits deliberate ignorance."[19] This testimony, along with the banks' descriptions of the deposits, established, at minimum, that Carbins was deliberately ignorant regarding the source of the bank drops.[20]

Carbins additionally contends, even if he knew, or was deliberately ignorant regarding, the source of the funds, such knowledge does not allow a permissible inference that he knew the deposits were the result of Doc's misappropriation of the means of identification of real people. Our review of Carbins' sufficiency challenge is "highly deferential to the verdict,"[21] and we are required to "draw all reasonable inferences . . . in favor of the verdict."[22] As the Government contends, Carbins' knowledge that the bank drops were

---

[18] The definition of the term "means of identification" for purposes of the aggravated identity theft statute includes "*any name . . . that may be used, alone or in conjunction with any other information, to identify a specific individual.*" 18 U.S.C. § 1028(d)(7) (emphasis added).

[19] *United States v. Churchwell*, 807 F.3d 107, 117 (5th Cir. 2015) (citation omitted).

[20] *See id.* ("Deliberate ignorance requires that a defendant (1) be subjectively aware of a high probability of the existence of illegal conduct; and (2) purposely contrive to avoid learning of the illegal conduct.") (citation omitted).

[21] *Chapman*, 851 F.3d at 376 (internal quotation marks and citations omitted).

[22] *Mahmood*, 820 F.3d at 187 (citation omitted).

No. 16-30998

IRS tax refunds necessarily supported a reasonable inference that the money had been obtained through the unlawful use of the means of identification of real people. A jury could reasonably infer that the IRS does not issue tax refunds unless the means of identification of real people have been submitted to it along with a request for a refund.

Finally, Carbins asserts that even if his knowledge of the source of the money could be deemed sufficient to impute knowledge of the unauthorized use of another person's means of identification, that knowledge came too late under *Rosemond v. United States*.[23] In that case, the Supreme Court addressed the application of the aiding and abetting statute when the underlying crime of conviction is "compound" in nature. The Court analyzed a prosecution for aiding and abetting an offense under 18 U.S.C. § 924(c), which forbids "us[ing] or carr[ying] a firearm" when engaged in a "crime of violence or drug trafficking crime."[24] It labeled § 924(c) a "combination" crime because it required (1) proof of the use or carriage of a firearm *and* (2) proof of the commission of a predicate offense (violent crime or drug trafficking).[25] The Court held that when a combination crime is involved, an aiding and abetting conviction requires that the defendant's intent "go to the specific and entire crime charged."[26] In a § 924(c) case, such intent requires "advance knowledge" of the firearm or "knowledge at a time the accomplice can do something with it—most notably, opt to walk away."[27]

As described above, the jury could have reasonably inferred that prior to the filing of the April 2013 tax returns, Carbins knew or was deliberately ignorant regarding the fact that the bank drops were IRS tax refunds. The

---

[23] 134 S. Ct. 1240 (2014).

[24] *Id.* at 1245 (citation omitted).

[25] *Id.* at 1245, 1248 (citation omitted).

[26] *Id.* at 1248 (citations omitted).

[27] *Id.* at 1249-50 (footnote omitted).

14

indictment charged Carbins with only one count of aggravated identity theft, and the district court instructed the jury that it needed to find aggravated identity theft as to only one of the identity victims in order to convict. Therefore, when the April 2013 tax returns were filed, Carbins would have had "advance knowledge" that the bank drop scheme involved the unauthorized use of the identities of real people and the ability to walk away from the scheme. Carbins' argument that he did not have the necessary intent under *Rosemond* is thus unavailing.

Based on the foregoing, Carbins' conviction for aiding and abetting aggravated identity theft is AFFIRMED.