# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-41174

United States Court of Appeals
Fifth Circuit

**FILED**
May 2, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

SEAN PAGE,

      Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:15-CR-214-1

Before STEWART, Chief Judge, and HAYNES and WILLETT, Circuit Judges.

PER CURIAM:*

    After a four-day jury trial, a jury in the Eastern District of Texas convicted Defendant-Appellant Sean Page ("Sean") of theft of government money or property and aggravated identity theft, in violation of 18 U.S.C. § 641 and 18 U.S.C. § 1028A.[1] On appeal, Sean challenges the sufficiency of the evidence supporting his convictions as well as the district court's imposition of

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Because Sean and his father Dalton Page share the same last name, we will refer to each of them by their first name throughout this opinion.

No. 16-41174

a sentence of 69 months' imprisonment. For the reasons explained herein, we AFFIRM Sean's convictions and sentence.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This case concerns fraudulent bidding for Department of Veteran Affairs and Department of the Army contracts specifically set-aside for Service-Disabled Veteran-Owned Small Business ("SDVOSBs").

Sean owned and operated two landscaping and janitorial services companies—Premier Building Maintenance ("PBM") and I2G Resource Group, Incorporated ("I2G")—that applied for and were awarded government contracts set aside for SDVOSBs. The SDVOSB program provides business opportunities for veterans who are disabled as a result of their military service. Every federal agency is required to set aside contracts for SDVOSBs—at least three percent of awarded contracts must go to qualifying SDVOSBs. Federal law and regulations set forth certain criteria for businesses to satisfy and certify to when applying for such set-aside loans. Before a business can qualify to bid for such contracts it must certify that it meets the standards to qualify as a SDVOSB with the Center for Veterans Enterprise.[2] The standard includes three core components: eligibility, ownership, and control.

Eligibility looks to whether a service-disabled veteran is indeed connected to the company and whether the company's size comports with the Small Business Administration's requirements. With respect to ownership, the service-disabled veteran or a combination of service-disabled veterans must be at least 51 percent owners of the company. Control requires that the service-

---

[2] In addition, government contractors certify their businesses through other systems, including the System for Award Management ("SAM"), which replaced the Central Contractor Registration ("CCR/FedReg"), and Online Representations & Certifications Application ("ORCA"). To confirm that a company meets the necessary certifications, the Army checks against the SAM system, relying entirely on the information placed into the system by the company.

disabled veteran or veterans be in charge of day-to-day operations and responsible for the long-term decision making of the company. The service-disabled veteran must also be the highest compensated individual of the business and, if not, a letter explaining why he or she is not must be submitted. The contracting officers responsible for overseeing the bidding process simply confirm that the SDVOSB is registered in one of the relevant online databases.

Sean never served in the armed forces and, by extension, never suffered a service-connected disability. Sean's father, Dalton Page ("Dalton") did, however, serve in the armed forces and receive such a service-connected disability. Dalton's service spanned 20 years of active duty with the U.S. Army in Japan, Germany, and Vietnam. Seventy-two years old at the time of trial, Dalton had several tours of duty in Vietnam, first as a crew chief and then as a forward observer. When Dalton returned home from the military, he was suffering from post-traumatic stress disorder ("PTSD") and eventually divorced from his first wife—Sean's mother. The Department of Veteran Affairs certified Dalton as 100 percent service-disabled in light of his PTSD and exposure to Agent Orange. Despite being listed as leading PBM and I2G in various certifications to contracting agencies, Dalton testified at trial that he had no involvement with PBM and I2G.

Testimony revealed that Sean bid for and was awarded various SDVOSB set-aside contracts from the Department of Veteran Affairs and the Department of the Army based on false certifications that Dalton led PBM and I2G. Dalton never provided Sean permission, tacitly or otherwise, to use his name or social security number for any purpose, including applying for contracts as a SDVOSB. In 2011, Sean's ex-girlfriend informed Dalton that Sean was using Dalton's identity, social security number, and name in relation to the SDVOSB set-aside contracts. Dalton confirmed this improper use

3

through I2G's website, which referenced documents concerning incorporation that had Dalton listed as CEO of I2G.

Deeply bothered by the discovery, Dalton invited Sean to visit his home to discuss the matter—a conversation that resulted in Sean simply responding, "I got to do what I got to do." The conversation left Dalton so angry afterward that he simply did not address the matter further. Rather, Dalton invited Sean back a few days later, telling Sean that he needed to remove Dalton's name from the company website and shut the companies down or Dalton would mail a letter to the Department of Veteran Affairs. This offer was made to Sean on three separate occasions; Dalton left a drafted letter undated on his office desk. Despite Dalton's admonishing him about the importance of the SDVOSB programs for service-disabled veterans, Sean did not seem to care.

Dalton mailed the letter to the Department of Veteran Affairs Office of the Inspector General in September 2011, a decision that was admittedly difficult for him to do to his "baby son." The letter informed the Department of Veteran Affairs that I2G misled the Department on its Form 0877 by listing Dalton as the CEO. The letter went on to explain that Dalton discovered that Sean stole Dalton's information and improperly listed him as having affiliation with I2G on the Form 0877. Dalton confirmed that C.T. Timmons, the individual listed as the registered agent for Sean's companies, was Dalton's stepfather and passed away about 42 years ago. Bryan Sewell, a special agent with the Department of Veteran Affairs Office of Inspector General in Dallas, Texas, began investigating the case in September 2011 and completed the investigation in September 2013, reporting his findings to the United States Attorney's Office in April 2014.

In a four-count indictment, three of which are relevant on appeal, Sean was charged with the following: (1) two counts of Theft of Government Money or Property, in violation of 18 U.S.C. § 641 (Counts One and Four); and (2) two

No. 16-41174

counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A (Counts Two and Three).[3]  Pursuant to Federal Rule of Criminal Procedure 29(a), Sean moved for acquittal at the close of the Government's case and again at the close of all of the evidence.  The district court denied each motion.

Sean was convicted on Counts One, Two, and Three. Prior to sentencing the Government noticed its intent to seek an upward variance.  At sentencing, the district court granted the Government's motion for an upward variance, sentencing Sean to 69 months' imprisonment. On appeal, Sean challenges the sufficiency of the evidence to maintain his convictions as well as the substantive reasonableness of his sentence.

## II.    DISCUSSION

### A. Sufficiency of the Evidence

As Sean properly preserved his challenge to the sufficiency of the evidence, this court reviews this issue *de novo*.  *See United States v. Umawa Oke Imo*, 739 F.3d 228, 235 (5th Cir. 2014).  "When reviewing the sufficiency of the evidence, the court must determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.*  (quotation marks omitted). The court must view the evidence "in the light most favorable to the verdict" and draw all reasonable inferences and make all credibility determinations in favor of the verdict.  *Id.* The Government may prove its case through direct or circumstantial evidence, and the jury may choose among reasonable constructions of the evidence. *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007). "[I]t [is] within the sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose

---

[3] After presenting its case-in-chief, the Government moved to dismiss Count Four of the Indictment.

5

among reasonable constructions of evidence." *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citation omitted).

*i. Theft of Government Property*

To establish a violation of 18 U.S.C. § 641, the Government was required to prove that: (1) Sean knowingly stole, embezzled, and converted money, property or a thing of value to his own or another's use; (2) the property or thing of value belonged to the United States government and had a value in excess of $1,000; and (3) Sean did so knowing that the money, property, or thing of value was not his and intended to deprive the owner of the use or benefit of the money, property, or thing of value. *See United States v. Dien Duc Huynh*, 246 F.3d 734, 745 (5th Cir. 2001).

Sean argues that the conviction must be overturned because the Government failed to provide sufficient evidence establishing the requisite intent or mens rea required for a violation of 18 U.S.C. § 641. Sean contends that he merely "made a material misstatement of facts by having Dalton listed as CEO in the certification application." He argues that to steal, as relevant to the statute, requires "wrongful taking" of another's money or property with the intent to deprive the owner of its use or benefit either temporarily or permanently.

The evidence marshalled against Sean was sufficient. Before turning to that testimony, we quickly dispose of Sean's misguided argument that a conviction on this count must fail because there is no dispute concerning the completion of work required under the contracts. This completion, Sean urges, is sufficient to require reversal. This argument is plainly foreclosed by this circuit's decision in *United States v. Barnes*, 761 F.2d 1026 (5th Cir. 1985). The *Barnes* decision, addressing misrepresentations made in connection with securing federal loans, rejected the defendant's contention that actual property loss was required to sustain a conviction for a § 641 violation because, among

other things, "imposition of an actual property loss requirement may prevent the prosecution of individuals who have intentionally misappropriated government funds." *Id.* at 1035.

Testimony revealed that documents used to verify that PBM and I2G satisfied the requirements to qualify as SDVOSBs listed Dalton's identifying information. Sean later amended certain filings in January 2013 to indicate that Dalton was no longer affiliated with PBM. Agent Sewell explained that the timing of the amendment was no surprise as his investigation had begun to "kick[] up a ton of dust." Agent Sara Hernandez, an investigator in the Major Procurement Fraud Unit of Army CID, testified that a proposal package for an Army contract awarded to Sean listed employees who never actually worked for the company. Contract specialists from both the Department of Veteran Affairs and Department of the Army who were familiar with the bidding process testified concerning SDVOSB set-aside contracts awarded to PBM and I2G that listed Dalton's identifying information. Agent Ariel Hernandez, an investigator with the Social Security Administration's Office of the Inspector General, was tasked with conducting research on social security numbers involved in the case. Agent Ariel Hernandez confirmed that the social security number ending in 7—the same number listed on various filings for PBM and I2G to satisfy SDVOSB requirements—was issued to Dalton during July of 1956.

Dalton testified that he never gave his son permission to use his name or social security number for any purpose, including applying for contracts as a SDVOSB. Dalton confirmed that C.T. Timmons, the individual listed as the registered agent for Sean's companies, was Dalton's stepfather and passed away nearly 42 years ago.

Testimony further revealed that the bank accounts that received payment for the contracts awarded to I2G and PBM belonged to Sean.

No. 16-41174

Faced with this evidence, Sean focused his defense on saying that Dalton agreed to set up the company and Sean's ex-girlfriend consistently filed all paperwork. When asked why Dalton simply did not sign any of the contracts, Sean explained that Dalton wanted to be behind the scenes and wanted cash for his gambling problem—a problem signified apparently by his two to three trips to the casino each month. Sean could not testify concerning how much money he had given Dalton nor provide an estimate. When asked why Dalton's name was not on any of the bank accounts, Sean explained that he "had the company started and then [they] wrote the company in with his name on it"— in other words, "the companies were started prior to Dalton, and he understood that . . . [PBM and I2G were]" janitorial, custodial, and landscaping services. When asked how much he paid his ex-girlfriend for all of her work he could only recall $10,500 to purchase two vehicles. He testified that he knew nothing of the September 2011 letter nor investigation when Dalton was removed from the business. He referred to the allegations in the September 2011 letter as a complete lie and contends Dalton never confronted him about the matter.

As the foregoing demonstrates, Sean's testimony was a case study in obfuscation. When prompted about various payments made to I2G and PBM on JPMorgan accounts where he had sole signing authority, his testimony is best summed up by "the U.S. Government did not pay Sean Christopher Page." Yet, Sean admitted to signing all the contracts, reviewing all the numbers, conducting all site visits, instructing subcontractors on what to do, and paying the subcontractors. Moreover, the money in the bank accounts that received payments for work done under the SDVOSB contracts was entirely under Sean's control.

Based on the foregoing, the jury was entitled to discredit Sean's testimony that he had nothing to do with filing these false certifications that led to PBM and I2G receiving government funds that were set aside for

8

SDVOSBs. *See United States v. Sertich*, 879 F.3d 558, 567 (5th Cir. 2018) (explaining that the "the jury was entitled to disbelieve [the defendant's] contention that he had a good faith belief he was not committing any crime"); *United States v. Gevorgyan*, 886 F.3d 450, 455 (5th Cir. 2018) (clarifying that determination of co-conspirator credibility when testifying "was the appropriate task of the jury.").

Viewing the evidence in the light most favorable to the verdict, the evidence was sufficient to support Sean's conviction for theft of government funds. *See, e.g.*, *United States v. Dowl*, 619 F.3d 494, 501–02 (5th Cir. 2010) (concluding that sufficient evidence was produced to support theft of government funds conviction where the defendant "submitted fraudulent applications to obtain the Government's funds and proceeded to use the funds inconsistently with their intended use . . . [because] th[e] scheme deprived the Government of the funds' economic value for aiding homeowners' rebuilding efforts after Hurricane Katrina"); *United States v. Howell*, 328 F. App'x 908, 911–12 (5th Cir. 2009) (per curiam) (unpublished) (upholding a theft of government funds guilty verdict where evidence demonstrated that the defendant filed for funds set-aside for Hurricane Katrina evacuees by "falsely certif[ying] in writing that she was a Hurricane Katrina evacuee" and subsequently receiving total of nearly $5,000 dollars). Evidence establishes that these VA benefits were Government property, *see, e.g.*, *United States v. Smith*, 596 F.2d 662, 664 (5th Cir. 1979), the value of those benefits were well in excess of $1,000, and Sean falsely certified that his businesses were SDVOSBs to obtain these funds that were set-aside for such companies. *See Dowl*, 619 F.3d at 501–02. A rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*ii. Aggravated Identity Theft*

To convict Sean of aggravated identity theft under 18 U.S.C. § 1028A, the Government was required to prove that he: "(1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to his commission of theft of Government money under § 641." *United States v. Carbins*, 882 F.3d 557, 563 (5th Cir. 2018) (alterations omitted). "The term 'means of identification' is defined as any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual[, including] . . . . any name, social security number, or date of birth." *Id.* "The Government was required to show that [Sean] knew that the means of identification at issue belonged to another person." *Id.* (quotation marks omitted).

Sean argues that the jury's verdict must be overturned because the conduct did not involve any identity theft—that is, Sean did not knowingly use Dalton's identity without Dalton's approval. Sean contends he did not steal Dalton's identity. Sean argues that the Supreme Court's decision in *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), compels that the jury verdict be overturned because the Supreme Court explained that a statute's "caption . . . can be used to clear up ambiguity." Continuing in that vein, Sean contends that § 1028A, as demonstrated by the title "Aggravated Identity Theft," does not permit "the Government[']s extremely broad theory of criminal liability" that an individual can be liable without proving that the identity was actually stolen.

Sean's argument that the evidence was insufficient to demonstrate that he used Dalton's identity without lawful authority because there was no evidence that he actually stole Dalton's identity must fail. Sean contorts the statute to support his contention that he must have "stolen the identity or social security number of his father, not have merely used it for an unlawful

purpose without the father's permission."  His argument fails because, as the Government properly notes, it is foreclosed by this circuit's decision in *United States v. Mahmood*. 820 F.3d 177, 189–90 (5th Cir. 2016) ("In sum, nothing in the plain language of § 1028A indicates that Mahmood must have actually stolen his patients' means of identification in order to be convicted of aggravated identity theft.").  There, the court upheld the jury's verdict of guilty after concluding there "was no evidence at trial that [the defendant] had consent to use his patients' identifying information to commit health care fraud." *Id.* at 190.

By extension, the evidence produced at trial was sufficient to demonstrate that Sean knowingly used Dalton's identification to perpetrate his commission of theft of government property.  Dalton wrote a letter to the Department of Veteran Affairs Office of the Inspector General explaining that Sean incorporated businesses using Dalton's identifying information without Dalton's knowledge or consent. Dalton testified that he never gave his son permission to use his name or social security number for any purpose, including applying for SDVOSB contracts. When Dalton asked his son to come over to discuss the matter, Sean simply responded, "I got to do what I got to do."  Contract specialists from both the Department of Veteran Affairs and Department of the Army testified concerning SDVOSB set-aside contracts awarded to PBM and I2G that listed Dalton's identifying information. Sean's conflicting testimony was not credited, and that determination is within the province of the jury.

Based on the foregoing, the evidence in the case is sufficient. *See, e.g.*, *United States v. Stephens*, 571 F.3d 401, 404–05 (5th Cir. 2009); *United States v. Davis*, 655 F. App'x 1017, 1020 (5th Cir. 2016) (per curiam) (unpublished) ("At trial, the victims testified that they did not give permission for Davis and

other co-conspirators to use their identifying information. . . . [T]he evidence was sufficient. . . .").

## B. Sentencing

Sean ends by challenging the substantive reasonableness of the district court's imposition of a 69-month sentence.  He contends that the district court gave significant weight to improper factors, *i.e.*, the amount of funds that he received from his scheme and his obstructive conduct, because his offense level was not enhanced on those grounds under the Sentencing Guidelines. Sean also suggests that, in varying upwardly on the theft of government property count, the district court should not have considered that he testified at trial. This court generally reviews the substantive reasonableness of a defendant's sentence for abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 46 (2007).  However, because Sean did not raise these arguments in the district court, our review here is for plain error. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *United States v. Mondragon–Santiago*, 564 F.3d 357, 361 (5th Cir. 2009).

Sean has failed to show that the district court abused its discretion or plainly erred.

The Presentence Investigation Report (PSR) assigned a total offense level of 10 on the conviction for theft of public funds.  That offense level, combined with Sean's criminal history category of I, resulted in a guidelines range of six months to one year in prison.  The Government filed a notice of its intent to seek an upward variance under § 3553(a)(1), and (2). The Government requested that Sean be sentenced to at least 51 months in prison as to his conviction for theft of public funds and to consecutive prison terms of 24 months for each aggravated-identity-theft conviction. The district court imposed a 21-month sentence with regard to the conviction for theft of public funds, and 24-month sentences as to each of the convictions for aggravated

identity theft. The district court ordered that the 24-month sentences run consecutively to each other and to the sentence for theft of public funds.

The district court indicated that the sentence was reasonable in view of the nature and circumstances of the offense, specifically: (1) Sean stole Dalton's identity and made false representations in order to seek and obtain contracts that were designated for service-disabled veterans; (2) Sean received payments on the falsely obtained contracts that exceeded $1.2 million; and (3) Sean organized the scheme and abused a position of trust to acquire funds that should have been awarded to service-disabled veterans. The district court identified that the sentence "w[ould] serve as just punishment, promote respect for the law, and deter future violations of the law." As to the upward variance, the district court noted that the sentence included an upward variance that was the equivalent of four levels based on, *inter alia*, the "profits that were received and the . . . obstruction due to [Sean's] lying repeatedly and things like that."

The district court's reasons for imposing an upward variance were fact-specific and consistent with the goals of § 3553(a). *See* § 3553(a)(1), (2); *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006). Regardless of whether a factor warranted an enhancement under the Guidelines, the district court could independently consider the § 3553(a) factors and decide whether a variance was merited on the basis of those factors. *See* § 3553(a); *see also* 18 U.S.C. § 3661. The record reflects that, under the totality of the circumstances, the degree of the upward variance was not so disproportionate so as to overcome the factors supporting its imposition. *See United States v. Brantley*, 537 F.3d 347, 349–50 (5th Cir. 2008). Although Sean's sentence was 12 months more than the top of the guidelines range, this court has upheld greater variances. *See, e.g.*, *Brantley*, 537 F.3d at 348–50 (upholding variance to concurrent terms of 120 months and 180 months from guidelines

imprisonment range of 41 to 51 months); *United States v. Herrera-Garduno*, 519 F.3d 526, 531–32 (5th Cir. 2008) (affirming an upward variance to a sentence of 60 months from a guidelines range of 21 to 27 months); *United States v. Jones*, 444 F.3d 430, 433, 441–42 (5th Cir. 2006) (affirming an upward variance or departure to a sentence of 120 months from a guidelines range of 46 to 57 months).[4]  The district court had an adequate basis for the sentence and was guided by the 18 U.S.C. § 3553(a) factors in finding that a variance was justified.  The district court made an individualized assessment, found that the guidelines range did not properly account for particular § 3553(a) factors, and offered fact-specific reasons for the variance.  *See Smith*, 440 F.3d at 707.

Sean's suggestion that, in determining that an upward variance was justified, the district court should not have considered his trial testimony is misguided.  He maintains that upwardly varying in light of a defendant's trial testimony could "have a chilling effect" on a defendant's right to testify.  However, the district court did not refer to the fact that Sean exercised his right to testify at trial in explaining the decision to vary; the district court instead noted that Sean offered false testimony.  Sean has not shown, and there is no indication, that false testimony or conduct that otherwise obstructs justice is an improper basis for an upward variance. *See United States v. Bolar*, 483 F. App'x 876, 884 (5th Cir. 2012) (per curiam) (unpublished) (holding that district court did not plainly err in varying where, *inter alia*, defendant gave false testimony and convinced a witness to perjure herself); *cf. Simons*, 540 F. App'x at 287 (noting that obstruction of justice was a proper basis for an

---

[4] Sean does not raise any argument as to whether the district court properly exercised its discretion in ordering the sentences for his convictions for aggravated identity theft to be served consecutively to each other. Thus, he has waived any challenge to that decision. *See* Fed. R. App. P. 28(a) (setting forth the requirements for briefing); *United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006).

upward variance). Also, to the extent that the variance was based on Sean's false statements, the district court did not solely refer to his trial testimony; the district court also noted that Sean made various false statements as part of his offense conduct. The nature and circumstances of the offense is a permissible basis for an upward variance. *See* § 3553(a)(1).

In sum, the district court did not plainly err nor abuse its discretion in selecting a sentence above the applicable guidelines range.

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM Sean's convictions and sentence.