# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 17-20230

———————

United States Court of Appeals
Fifth Circuit

**FILED**
August 21, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

ISRAEL ARQUIMIDES MARTINEZ,

      Defendant - Appellant

———————

Appeal from the United States District Court
for the Southern District of Texas

———————

Before STEWART, Chief Judge, and JONES and ENGELHARDT, Circuit Judges.

CARL E. STEWART, Chief Judge:

After a months-long investigation into hiring practices at Waste Management Incorporated ("WMI"), the Government charged Defendant-Appellant Israel Arguimides Martinez and several co-defendants with various immigration crimes stemming from their participation in efforts to recruit and retain undocumented immigrants for employment at WMI in Houston, Texas. Martinez was later also charged by Superseding Indictment with several counts of identity-theft stemming from the same underlying scheme. After a nine-day jury trial, Martinez was convicted of all 18 counts charged in the Superseding Indictment and was sentenced to 87 months of imprisonment and three years of supervised release. He now challenges the sufficiency of the

No. 17-20230

evidence supporting his conviction, arguing primarily that he was never involved in the scheme giving rise to his charges. Because the Government presented sufficient evidence to support the jury's guilty verdict, we AFFIRM.

## I.     BACKGROUND

WMI is a waste disposal and environmental services company headquartered in Houston, Texas. WMI maintained a facility on Afton Road in Houston ("Afton Road location") where employees held various positions, including those of "helpers,"[1] drivers, commercial route managers, technicians, maintainers, welders, hazardous material experts, and landfill gas operators. Martinez worked as the residential operations lead driver for WMI for several years leading up to his arrest.

WMI hired its employees through Associated Marine and Industrial Staffing Company ("AMI"), a staffing and payroll services company contracted by WMI to provide part-time employees. Mary Louise Flores ("Flores") and Fernando Emmanuel Bustos ("Bustos") were on-site supervisors for AMI at WMI's Afton Road location. Flores had worked for AMI for 12 years before her arrest, and she began working at the Afton Road location in 2011 as AMI's onsite representative. She held that position for 11 months.

Applicants who sought employment at WMI would submit their applications, in addition to an identification or resident card and a Social Security card, through AMI. AMI was responsible for conducting employment eligibility verification through the Department of Homeland Security's E-Verify/Basic Pilot Program ("E-Verify").[2] AMI was also required to examine

---

[1] "Helpers" are WMI employees who ride on the back of waste disposal trucks during trash pickup routes.

[2] E-Verify is an internet-based system that allows an employer, using information reported on a prospective employee's Employment Eligibility Verification Form ("I-9"), to determine the eligibility of that employee to work in the United States.

No. 17-20230

documentation provided by prospective employees for genuineness at the time of hire to verify their identity and employment eligibility.

According to several trial witnesses, it was "common knowledge" at WMI that most of the helpers were undocumented immigrants, and several of the illegally hired helpers testified that they had used fake documents purchased at flea markets to procure employment at WMI through AMI. In 2011, Staff Management, an auditing company for WMI, examined and audited AMI's employee records and confirmed that many of the helpers staffed by AMI at WMI were working there illegally. Flores was instructed to "clean house," that is, to fire all of the undocumented aliens staffed by AMI and working at WMI.

Flores notified Cesar Arroyo Santiago ("Santiago"), WMI's district operations manager, of her directive, but Santiago declined to take immediate action because WMI's entire operations system would be negatively affected for lack of capable, competent employees. Flores thereafter discussed the need to "clean house" with Martinez on several occasions, and he advised that it would be difficult to find the right people for the job. Nonetheless, AMI and WMI began incrementally firing undocumented or illegally documented employees.

During a staff safety meeting on January 31, 2012, WMI employees were told that their employment documents would be checked and, if found invalid, they would be terminated. Santiago, Flores, Martinez, and Rudy Martinez (of no relation, and hereinafter called "Rudy"),[3] Martinez's supervisor, were present at the meeting. Santiago notified the helpers that they needed to provide the proper identification documents or else they would be fired, and Flores joined Santiago in encouraging the helpers to find valid identification and Social Security numbers and return to WMI. Martinez did not say

---

[3] Rudy and Martinez were tried together. Rudy is not a party to this appeal.

anything at the meeting. Approximately 45 WMI employees did not have valid employment documents and were fired after the January 2012 safety meeting. Flores and Santiago told the fired helpers that they could return to work if they brought valid documents, even if they belonged to another person.

Shortly after the January 2012 safety meeting, Flores and Martinez discussed ways for illegally employed helpers to continue working at WMI. According to Flores, Martinez suggested that they assign the identities of former applicants and employees to the illegal helpers. Flores testified that Martinez gathered and provided previous driver logs that included the names of former helpers. Flores then reviewed the records to confirm whether the former employees were still active in the AMI system, which would mean that no further documentation would be needed. She would then reactivate the individual's status in AMI's system. Martinez and Flores took the idea to Santiago, who assented.

Over the course of several months, Flores, Santiago, and Martinez executed their plan by identifying former helpers, reactivating them in AMI's employment system, and assigning their identities to illegal helpers. According to the Government, approximately 25 illegal aliens procured identification documents of other persons and returned to work under different names at WMI with the knowledge of Martinez, Flores, Rudy, and Santiago. The fired-and-rehired helpers received unique personal identification numbers ("PINs") that corresponded to their new identities and were required to sign and cash their paychecks under their new names.

These rehired helpers included Inmer Guzman-Ventura, who testified that Martinez instructed him to contact Flores about getting his job back. When he was rehired, Guzman-Ventura was given several names to work under. Another individual, Everado Gonzalez-Martinez, returned to work at WMI under a new identity after the mass firing at Flores's direction. After his

No. 17-20230

initial new identity was revoked, Martinez instructed him to get a good, or valid, Social Security number. After Gonzalez-Martinez got a new Social Security number, he was instructed by Martinez to take his identification information to Flores. The Government also produced Jose Soriano-Ventura, who testified that Flores assigned him a new name after he was told he could no longer work under his initially given name. Willians Campos-Lopez testified that after the mass firing, he received a phone call from Martinez, who told him he could return to work under the name Gabriel Alvarez and signed his paychecks under the name Alvarez as instructed by Martinez. Campos-Lopez also testified that shortly after the January 2012 meeting, Martinez told him to call three or five other fired helpers and advise them to return to WMI, and that Martinez would help them obtain new identities. Noe Baudilio-Garcia testified that he spoke with Martinez shortly after the mass firings and was told to speak with Flores about getting his job back. Alexander Garcia-Lopez also stopped working at WMI because he lacked valid identification documents, but he received a call from Martinez telling him not to worry about his job because he would continue to work under another name. Garcia-Lopez thereafter received a new name (Tomas Gomez) from Martinez. Jesus Barrientos-Alvarado testified that he obtained valid documents on his own and submitted a new, different name to Martinez who did not show any surprise upon receiving the new documents. Finally, Jose Benitez testified that, at the direction of Martinez, he obtained a new name on his own and submitted it to Flores, and Martinez called him by his new name.

The identification-reassignment scheme created some confusion among the orchestrators and, according to Flores, she and Martinez worked closely to keep the undocumented employees' identities straight. The two of them even created "cheat sheets" to keep track of their work. The "cheat sheets" changed almost daily, and Martinez reviewed the sheets with Flores a couple of times

per week to ensure that a legitimate name was not used during the same week by more than one helper. Flores also testified that she occasionally saw Martinez hand rehired helpers a slip of paper with a PIN linked with another person's valid identification information to use for clocking in. Santiago testified that he had witnessed Martinez encouraging illegal helpers to obtain the identification documents of another person to continue working. Both Flores and Santiago confirmed that Martinez had no authority to hire people to work at AMI or WMI and that he was not in charge of screening employees.

Other WMI employees testified about the scheme. Rose Schuler, a driver at WMI, testified that she personally saw several fired helpers return to work, and she was instructed by Martinez to call them by different names. She also testified that Martinez told her WMI could not assist helpers in obtaining work visas but suggested the helpers find people who were not using their Social Security numbers, such as people who were in jail. Teri Minarcik, who worked as a residential route manager at WMI, testified that she noticed that several helpers who had been at WMI for years disappeared but returned to work with new names. Minarcik confirmed that Martinez did not hire anyone and that helpers were hired through AMI.

Special Agent Eleazar Paredes, a member of the Immigration and Customs Enforcement ("ICE") Work-Site Enforcement Group who conducted the investigation into WMI, was initially informed that WMI was employing illegal immigrants by two disgruntled illegal helpers who were dissatisfied with the working conditions at WMI and were concerned they would lose their jobs if they did not obtain new identities. At trial, Special Agent Paredes identified several illegal helpers recruited by AMI and WMI whom he had interviewed and who had told him that they were encouraged to return to work if they were able to get valid Social Security cards.

No. 17-20230

Federal agents executed a search warrant at WMI's Afton Road location on April 24, 2012. The agents discovered and arrested 16 illegal employees in the building. Over the next several months, agents debriefed over a dozen witnesses who had illegally worked for AMI at WMI and who stated that although Martinez knew the AMI workers were illegally employed, he and others repeatedly told them to obtain new, valid employment documents. Additionally, three victims whose identities were used by illegal helpers testified that they did not authorize anyone to use their identification information for employment at WMI.

At trial, Martinez moved for a judgment of acquittal twice—at the close of the Government's case and again at the close of the defense's case—and was twice denied. In its jury instructions, the district court explained to the jurors the possibility of convicting Martinez on the theory of *Pinkerton* liability, that is, that Martinez might be liable for the criminal acts of his charged and uncharged co-conspirators, although he himself may not have personally committed each element of each crime charged. *See Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946). The district court also instructed the jurors on the law applicable to aiding and abetting the commission of the substantive offenses charged in the Superseding Indictment.

On April 8, 2016, the jury returned a guilty verdict on all 18 counts of the Superseding Indictment.[4] Martinez was thereafter sentenced to 87 months of imprisonment and a three-year term of supervised release. He timely appealed.

## II.   DISCUSSION

Martinez challenges the sufficiency of the evidence supporting his conviction of all counts, arguing that the evidence did not establish his

---

[4] Rudy was also convicted of all 18 counts charged in the Superseding Indictment.

knowledge of or participation in the crimes charged. Because Martinez timely moved for a judgment of acquittal at the close of the Government's case and after the jury returned its verdict under Federal Rule of Criminal Procedure 29(c), his appeal is subject to de novo review. *United States v. Jimenez-Elvirez*, 862 F.3d 527, 533 (5th Cir. 2017). Martinez's sufficiency-of-the-evidence challenges are evaluated "with substantial deference to the jury verdict." *United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc). Thus, we will affirm "if a reasonable juror could conclude that the elements of the crime were established beyond a reasonable doubt." *United States v. Evans*, 892 F.3d 692, 702 (5th Cir. 2018). The court must "view[] the evidence in the light most favorable to the verdict" and draw "all reasonable inferences from the evidence to support the verdict." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (*quoting United States v. Ragsdale*, 426 F.3d 765, 770–71 (5th Cir. 2005)).

*A. Conspiring to Hire and Hiring Illegal Helpers*

Counts One and Two of the Superseding Indictment charge Martinez with conspiring to hire ten or more undocumented aliens and the underlying substantive offense. To prove Martinez's guilt for the conspiracy charge, the Government was required to establish beyond a reasonable doubt (1) the existence of an agreement between two or more persons to pursue an unlawful objective (here, to hire undocumented aliens), (2) that Martinez knew of the conspiracy and intended to and did join it, and (3) that one of the members of the conspiracy performed an overt act in furtherance of the conspiracy. *United States v. Read*, 710 F.3d 219, 226 (5th Cir. 2012) (per curiam); *see also* 18 U.S.C. § 371. An express or explicit agreement is not required; "a tacit agreement is enough." *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014) (*quoting United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997) (internal quotation marks omitted)). Evidence of a conspiracy and a

defendant's participation in it may be circumstantial, and a jury may infer that a conspiracy exists based on "the presence, association, and concerted action of the defendant with others." *United States v. Curtis*, 635 F.3d 704, 719 (5th Cir. 2011) (internal quotation marks and citation omitted). Mere association with a co-conspirator alone does not support an inference of participation in a conspiracy. *United States v. Welch*, 656 F.2d 1039, 1055 (5th Cir. 1981). Uncorroborated testimony from an accomplice or a cooperating witness may support a conviction so long as the testimony is not incredible or otherwise facially insubstantial. *Shoemaker*, 746 F.3d at 623. Testimony is not incredible "unless it pertains to matters that the witness physically could not have observed or events that could not have occurred under the laws of nature." *Id.* (internal quotation marks and citation omitted).

To find Martinez guilty of unlawfully employing ten or more unauthorized aliens, the Government was required to prove that, during the period of the conspiracy, Martinez knowingly hired at least ten persons with actual knowledge that they were unauthorized aliens and that they were brought to the United States in violation of 8 U.S.C. § 1324(a).[5] *See* 8 U.S.C. § 1324(a)(3)(A). To prove that Martinez aided and abetted the commission of that

---

[5] The governing statute's definition of "alien" carries with it complexities and nuances that this circuit has not previously had the opportunity to flesh out. 8 U.S.C. § 1324(a)(3)(A) criminalizes hiring for employment at least ten individuals with actual knowledge that the individuals are aliens as described in subparagraph B. Subparagraph B goes on to define an "alien" as one "who . . . (i) is an unauthorized alien (as defined in section 1324a(h)(3)) . . . , *and* (ii) has been *brought into the United States in violation of this subsection.*" 8 U.S.C. § 1324(a)(3)(B) (emphasis added). It is not altogether clear whether "this subsection" refers to Section 1324(a)(3) as the relevant subsection under Section 1324(a) or to another provision within Section 1324. Reading "this subsection" to refer to Section 1324(a)(3) might suggest that the Government must prove that the aliens were knowingly brought into the United States (as opposed to having arrived in the United States on their own) by the employer, *i.e.*, by Martinez, or by a third party, which is not alleged here and which is not clear from the record. In any event, Martinez did not raise this specific statutory interpretation point before the district court or on appeal, and so the point is not before us in this case.

offense,[6] the evidence must establish that Martinez "associated with the criminal venture, participated in it and sought by his actions to make the venture succeed." *Jimenez-Elvirez,* 862 F.3d at 535 (*quoting United States v. Villenueva,* 408 F.3d 193, 201 (5th Cir. 2005) (internal quotation marks omitted)); *see also* 18 U.S.C. § 2. Martinez must have had the same criminal intent that is required for the substantive offense, although the Government need not prove he personally completed each act required for the substantive offense. *See United States v. Anderson,* 174 F.3d 515, 522–23 (5th Cir. 1999). Evidence that supports a conspiracy conviction is generally sufficient to support an aiding and abetting conviction. *Jimenez-Elvirez,* 862 F.3d at 535 (internal quotation marks and citations omitted).

Martinez argues that the Government's evidence merely demonstrates that he "associated with those participating in" the conspiracy, not that he had actual knowledge of the conspiracy. He also contends that he lacked the authority to hire the illegal helpers and therefore cannot be convicted for hiring illegal aliens or conspiring to do so.

First, although "mere presence with conspirators or knowledge of a conspiracy is insufficient to convict a defendant of conspiracy," *Welch*, 656 F.2d at 1055, the evidence mounted against Martinez at trial surpasses establishing "mere presence" and directly implicates him as an active participant in the conspiracy. As an initial matter, Martinez has maintained on appeal that he gave Flores and Santiago the idea to reassign valid identification documents to illegally employed helpers. Flores and Santiago both testified as such at trial, stating that Martinez proposed the plan to rehire the then-recently fired helpers and to assign to them the identities of former helpers and applicants.

---

[6] One who aids or abets the commission of an offense against the United States may be punished as a principal to such offense.  18 U.S.C. § 2.

No. 17-20230

Flores also testified that Martinez supplied her with identities to reassign and worked closely with her to implement the plan of rehiring illegal helpers. Once the plan was underway, Flores testified that Martinez helped her keep the new identities of the rehired helpers straight and referred to the helpers by their newly assigned identities.

Flores's and Santiago's testimony is corroborated by several fired helpers, who testified that Martinez either directed them to Flores to procure identification information to start working again, or specifically instructed them to obtain valid identification documents so that they may resume working at WMI. Martinez's former co-workers' testimony also associates him with the identity-reassignment scheme. Rose Schuler testified that Martinez knew the rehired helpers were working under different names, and that he specifically instructed her to call the rehired helpers by their new names. Finally, Special Agent Paredes testified that he met with and interviewed several former helpers who explained that Martinez either called them to return to work or gave them new identities to enable them to return to work. The foregoing more than adequately incriminates Martinez as having knowledge of and being an active, willing participant in the conspiracy to rehire illegal helpers.

That Martinez himself lacked the authority to hire illegal helpers does not absolve him of criminal liability for the identity-reassignment conspiracy. Although the Government was required to prove that Martinez joined in the object of the conspiracy, it was not necessary to prove that he committed a substantive offense that was the object of the conspiracy. *United States v. Cuesta*, 597 F.2d 903, 918 (5th Cir. 1979). That is, the Government did not need to prove that Martinez had hiring authority to convict him of conspiring to hire illegal aliens as long as there was evidence establishing Martinez's knowing association with the conspiracy and that a co-conspirator did have the

11

authority to hire and used that authority to hire illegal aliens. Here, Flores testified that she used her position as an AMI representative to access AMI files and reassign legal identities to illegal helpers, and several illegally rehired helpers testified that Flores assisted them in obtaining new identities to resume working at WMI. Because of Flores's participation in the conspiracy, a jury could convict Martinez of conspiring with Flores to hire illegal helpers.

The evidence supporting Martinez's conspiracy conviction is also sufficient to support his conviction for aiding and abetting in hiring undocumented aliens. Flores's and Santiago's testimony about Martinez's participation in the conspiracy demonstrates Martinez's willing cooperation in advancing the scheme and its underlying objective of rehiring a formerly illegally employed workforce. Their testimony is again corroborated by the illegal helpers, who testified about Martinez's efforts in assisting the helpers with obtaining valid identification documents. Additionally, Martinez's former co-workers' testimony establishes that Martinez worked diligently to ensure that the identity-reassignment scheme was not foiled by inadvertently referring to rehired helpers by their actual names. All of this evidence demonstrates that Martinez "associated with the criminal venture" of rehiring illegal helpers, "participated in it and sought by his actions to make the venture succeed," *Jiminez-Elvirez*, 862 F.3d at 535, and thereby supports his aiding-and-abetting conviction.[7]

---

[7] Because the district court instructed the jury on the applicability of *Pinkerton* liability, Martinez's conviction for the substantive offense of hiring illegal aliens can also be sustained on the basis of his actions as a co-conspirator with Flores and Santiago notwithstanding his lack of hiring authority. *United States v. Solis*, 299 F.3d 420, 446–47 (5th Cir. 2002).

No. 17-20230

### B. *Conspiring to Encourage and Encouraging Illegal Aliens to Reside in the United States*

To establish a conspiracy to encourage or induce unlawful aliens to reside in the United States, the Government was required to prove that Martinez (1) agreed with one or more persons, (2) to encourage or induce the aliens named in Counts 4 through 13 of the Superseding Indictment to come to, enter, or reside in the United States, (3) with knowledge or reckless disregard of the fact that coming to, entering, or residing in the United States violated the law, and (4) for the purpose of private financial gain. 8 U.S.C. § 1324(a)(1)(A)(iv), (v)(I).

Conviction of the substantive offense required a showing that: (1) the individuals were aliens; (2) Martinez encouraged or induced the aliens in Counts 4 through 13 to come to, enter, or reside in the United States; (3) he knowingly or recklessly disregarded the fact that coming to, entering, or residing in the United States violated the law; and (4) he did so for the purpose of private financial gain. *See* 8 U.S.C. §§ 1324(a)(1)(A)(iv), (a)(1)(A)(v)(II).

Martinez's sufficiency challenge substantially mirrors that lodged against his conviction for Counts One and Two: he lacked the authority to hire illegal helpers and therefore could not have conspired to encourage unlawful aliens to enter into or reside in the United States or have committed the substantive offense. He adds that because the illegal helpers were already present in the United States, they did not need to be induced or encouraged to enter or stay.

Martinez's arguments are again meritless and contrary to the evidence presented at trial. Both Flores and Santiago testified that they, along with Martinez, agreed to assign new, valid identities to the formerly fired illegal helpers. Martinez and his co-defendants also gave the illegal helpers their new PINs, and Martinez personally helped verify whether certain PINs

corresponded with certain illegal helpers. Additionally, Martinez helped Flores create cheat sheets to keep the illegal helpers' new identities straight. This evidence, in addition to that mentioned in relation to Counts One and Two, demonstrates Martinez's active participation in the conspiracy of encouraging illegal helpers to reside in the United States for purposes of financial gain. *See United States v. Chapman*, 851 F.3d 363, 377 (5th Cir. 2017) ("Based on the extensive evidence of 'concert of action' amongst [the defendant] and others, the jury could reasonably infer an agreement, as well as [the defendant's] knowledge, intent, and voluntary participation." (citations omitted)).

That Martinez lacked hiring authority is inconsequential, as his co-conspirators had (and used) their own hiring authority to recruit and hire the illegal helpers. Nor does Martinez's argument that the illegal helpers were not induced or encouraged to reside in the United States because they were already residing in the country have any merit. Several rehired illegal helpers testified that they remained in the United States to improve their livelihoods and their families' financial positions, and that working at WMI helped accomplish these goals.[8]

Martinez's sufficiency challenges to the substantive offenses are also without merit. Because Martinez was charged with aiding and abetting in these offenses, the Government need not establish that Martinez "actually completed each specific act charged in the indictment" but only that he assisted in the actual perpetration of the offense "while sharing the requisite criminal intent." *United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002). Evidence

---

[8] Though the issue has not been directly addressed by this circuit, other circuits have rejected arguments that a conviction under § 1324(a)(1)(A)(iv) cannot be sustained where the illegal aliens in question already resided in the United States at the time of the alleged wrongful encouragement or inducement occurred. *See, e.g., Edwards v. Prime, Inc.*, 602 F.3d 1276, 1295–96 (11th Cir. 2010); *United States v. Oloyede*, 982 F.2d 133, 136–138 (4th Cir. 1993).

that supports a conspiracy conviction "is generally sufficient to support an aiding and abetting conviction as well." *Jiminez-Elvirez*, 862 F.3d at 535 (internal quotation marks and citations omitted).

We hold that there is sufficient evidence to sustain Martinez's convictions for encouraging or inducing the illegally rehired helpers to reside in the United States. As outlined above, several of the illegal helpers specifically identified Martinez and other WMI managers as either directing them to Flores to procure new identification for employment at WMI, or encouraging them to get a "good Social Security number." Further, Martinez knew that each of the individuals he encouraged to secure valid identification documents were illegal aliens; this fact was not only "common knowledge" but was also the driving force behind the creation and execution of the scheme.

This evidence is sufficient to demonstrate that Martinez "associated with the criminal venture, participated in it and sought by his actions to make the venture succeed" and therefore supports his convictions for aiding and abetting in the commission of the crimes charged in Counts 4–13. *Jiminez-Elvirez*, 862 F.3d at 535.

### C. Aiding and Abetting Aggravated Identity Theft

The aggravated identity theft statute provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A. The list of offenses enumerated in subsection (c) of the statute includes the immigration crimes for which Martinez was convicted under Counts 1–13 of the Superseding Indictment. *See* 18 U.S.C. § 1028A(c)(10). To convict Martinez of aggravated identity theft, the Government was required to prove that Martinez "(1) knowingly used (2) the means of identification of

another person (3) without lawful authority (4) during and in relation to [the crimes connected with Counts 1–13]." *See United States v. Carbins*, 882 F.3d 557, 563 (5th Cir. 2018). The term "means of identification" is defined as "*any name* or number that may be used, alone or in conjunction with any other information, *to identify a specific individual*." 18 U.S.C. § 1028(d)(7) (emphasis added). This includes any name, social security number, or date of birth. *Id.* § 1028(d)(7)(A). The Government was required "to show that [Martinez] knew that the means of identification at issue belonged to another person." *Carbins*, 882 F.3d at 563–64 (*quoting Flores-Figueroa v. United States*, 556 U.S. 646, 657 (2009)) (internal quotation marks omitted). "[A] person is liable under [18 U.S.C. § 2] for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission." *Id.* at 564 (internal quotation marks and citations omitted).

Martinez argues he neither possessed nor transferred any other person's identification documents because all identifying information was in the exclusive possession of AMI and Flores. The evidence produced at trial supports this assertion: the Government did not present evidence implicating Martinez as having directly provided Social Security cards or other identification information to rehired helpers. Rather, the evidence identifies Flores as having assigned the rehired illegal helpers with the identities of former applicants and legal employees.

Even so, the evidence implicating Flores as having assigned identities to rehired helpers, and the testimony identifying Martinez as having transferred PINs linked to the former legal employees and applicants to the rehired illegal helpers, demonstrate that "Martinez associated with the criminal venture [of aggravated identity theft], participated in it and sought by his actions to make the venture succeed." *Jimenez-Elvirez*, 862 F.3d at 535. This evidence, along

with the seeming concession (and supporting testimony of Flores and Santiago) that Martinez at a minimum played a large role in devising the plan to reassign legal identification documents to rehired illegal helpers, establishes that Martinez aided and abetted in the commission of aggravated identity theft with the requisite criminal intent, although he did not himself directly handle any of the victims' identification documents. Flores's and Santiago's testimony that Martinez created the plan also undercuts his argument that Flores may have assigned fictitious names and identities to the rehired helpers. Martinez specifically suggested that Flores and Santiago use the valid documents of former employees and applicants (and even gathered some former driver logs that identified the names of former employees and applicants).

Because of all the evidence cementing Martinez as central to the identification-assignment scheme, and because the Government did not need to prove that Martinez was in physical possession of the identity theft victims' identification information to sustain a conviction for aiding and abetting aggravated identity theft, we hold that "a reasonable juror could conclude that the elements of the crime [of aiding and abetting aggravated identity theft] were established beyond a reasonable doubt." *Evans*, 892 F.3d at 702.

## III.   CONCLUSION

The evidence produced at trial was sufficient to support Martinez's conviction. His conviction and sentence are therefore AFFIRMED.